[L. A. No. 9139. In Bank.—October 31, 1929.]

BURTIS L. HUTCHINS, as Administrator, etc., Plaintiff and Appellant, v. SECURITY TRUST & SAVINGS BANK (a Corporation), Defendant and Appellant.

464

W. W. Middlecoff and Milton K. Young for Plaintiff and Appellant.

Lucius K. Chase and Alan Nichols for Defendant and Appellant.

O'Melveny, Tuller & Myers, *Amicus Curiae*.

PRESTON, J.—This cause is a by-product of a controversy said to have existed between a man and his wife, who lived together as such for a period of sixty-four years. The scene opened with an ordinary simple action to quiet title to an undivided half-interest in certain Los Angeles property known as the Spokane Hotel. The defendant replied with a general denial of all claims made and rested its possession and right to possession of the property in suit upon a conveyance thereof to it in trust executed by the plaintiff's testate, Caroline L. Hutchins and her husband, John S. Hutchins, on December 24, 1913. The answer was verified and plaintiff failed to deny the genuineness and due execution of this instrument.

The action was begun on December 11, 1923. On these pleadings the cause went to trial on November 9, 1925, and it soon developed that the sole issue was the claim of the right to rescind said instrument and annul it in so far as it applied to the decedent, Caroline L. Hutchins upon the ground that her signature thereto was induced by the fraud and undue influence of her husband the co-grantor therein. Plaintiff demanded and received, over the vigorous objections of defendant, the right of a jury trial. Some nineteen alleged material issues of fact were submitted to said jury and answered by it favorably to plaintiff. A general verdict was also rendered for plaintiff. At this juncture plaintiff advanced the position that said conveyance was void *in toto* on its face and asked for a decree awarding him possession of the whole property. The court, however, adopted the verdicts of the jury, both general and special and embodied them as part of its judgment, but it did not give plaintiff the right of possession of the whole property; from the judgment in this respect, plaintiff has himself appealed. Defendant bank, however, has appealed from the whole of said judgment.

As we have found defendant's appeal to be meritorious and to require a reversal of the judgment *in toto,* plaintiff's appeal necessarily aborts. All the legal phases of the controversy have their root in the conveyance above mentioned, and we here epitomize the material provisions thereof, as follows:

The first parties, said John S. and Caroline L. Hutchins, reserve to themselves during their joint lives the possession,

use, occupation, rents, issues and profits of the premises but, provided, that ''said premises are hereby conveyed in trust nevertheless, subject to the reservation aforesaid for the following uses, purposes and trusts''; then follows subdivision one to the effect that on the termination of the life estate and until the end of the term of the trust, the second party, defendant Security Trust & Savings Bank, shall have full possession, control, custody and management of the property conveyed and shall lease and re-lease it for such times, to such persons and upon such terms and conditions as to it may seem best; shall collect all rents, issues, profits and income accruing from said property and, after the payment of all costs, charges, assessments, taxes, and every other cost, charge or expense including the expense of care, management, repair and protection of said property, shall distribute the net income therefrom as follows:

''Second: The entire net income derived or received from said trust property shall be applied and disposed of as follows: (a) There shall be paid to said Caroline L. Hutchins, if still living, quarterly on the first days of January, April, July and October of each year to and until the end or termination of this trust, or until her death, whichever event shall happen first, the sum of nine hundred dollars ($900), or such lesser sum as she may by writing delivered to the said trustee elect to accept. (b) The balance of net income on hand at the end of each such quarter shall be by said trustee applied and paid as rapidly as allowable in discharging and satisfying, in whole or in part, any and all mortgages or like incumbrances then affecting said trust estate. (c) After the discharge of all such incumbrances and until the demise of said Caroline L. Hutchins, each such quarterly balance of net income, and after the discharge of such incumbrances and the demise of said Caroline L. Hutchins then the whole quarterly amount of such income, shall be by said trustee distributed and paid, on said quarterly dates, to our sons Day S. Hutchins, Ray Hutchins and Burtis L. Hutchins and our great-grandson Reason D. Hardesty, in the following parts or shares: Day S. Hutchins, five twentieths (5/20); Ray Hutchins, eight-twentieths (8/20); Burtis L. Hutchins, six-twentieths (6/20); Reason D. Hardesty, one twentieth (1/20).'' Further contingencies were provided in the event

of the death of the above-named beneficiaries, which said conditions are not material here.

At the threshold, we observe that the settlers of this trust were John S. Hutchins and Caroline L. Hutchins, his wife; that the immediate beneficiaries upon the death of the settlers were their three children and a great grandson and upon certain contingencies other lineal descendants were to participate. Neither the personal representative of the deceased settler, John S. Hutchins, nor any of the *cestui que trustent* were made parties to this action. The validity of the trust is assailed and the trustee is made the sole reputed representative of all the parties concerned. In other words, while alleging there is no trust, the trustee is admitted to be such to the extent of having power to represent the beneficiaries as well as the heirs at law or legatees of one of the settlers. The attention of the court was called several times to this absence of parties. It is manifest that in a controversy by one settler with the other settler and/or beneficiaries, the trustee is in no sense the representative of either faction. A trustee is given by statute the right to sue in execution of the powers conferred without joining beneficiaries as plaintiffs, but this applies only as against strangers to the instrument and has no application to suits by or against makers and beneficiaries thereunder involving the validity of the trust instrument.

 This principle was carefully explained and section 369 of the Code of Civil Procedure interpreted in the case of *Mitau* v. *Roddan,* 149 Cal. 1 [6 L. R. A. (N. S.) 275, 84 Pac. 145]. In fact, the identical point here involved was before us in the recent case of *Lake* v. *Dowd,* 207 Cal. 290 [270 Pac. 212] (see 277 Pac. 1047), and the cause was reversed for failure of the court to order of its own motion, certain of the settlers, who were also beneficiaries, made parties to the action. This doctrine was again confirmed in *Title Guarantee & Tr. Co.* v. *Henry et al., ante,* p. 185 [280 Pac. 959]. No lack of interpleading, omission or negligence of the trustee will excuse this omission (*O'Connor* v. *Irvine,* 74 Cal. 444 [16 Pac. 236]; *Lake* v. *Dowd, supra*). The theory of this principle doubtless is that no decree should be entered affecting the rights of a party without giving him an opportunity to be heard and the negligence or failure of another will not justify his absence from the case.

But it is contended that this trust is structurally defective in that it contains certain provisions which are void, which void provisions are so interwoven with the other provisions that the whole instrument must fail as a matter of law, and for that reason no legal harm can result to the absent parties; hence a court of equity may be excused for failure to order in otherwise material parties. Much thought and research has been given by counsel to the legal structure of this trust conveyance and *amici curiae* have aided us in our labors.

Plaintiff points to the provisions respecting the amortization of encumbrances on property from a portion of the net income therefrom received from time to time by the trustee and then points confidently to the provisions of sections 723 and 724 of the Civil Code, which are to the effect that all directions for the accumulation of the income of property, except such as are allowed by that title, are void. The trusts allowed generally by the title are found in section 724, which provides that accumulations of income of property, for the benefit of one or more persons, may be directed by any will or transfer in writing sufficient to pass the property out of which the fund is to arise, provided that if such accumulations are directed to commence on the creation of the interest out of which the income is to arise, they must be made for the benefit of one or more minors then in being, and terminate at the expiration of their minority; or, if such accumulations are directed to commence at any time subsequent to the creation of the interest out of which the income is to arise, they must commence within the time permitted by the title for the vesting of future interests, and during the minority of the beneficiaries, and terminate at the expiration of such minority. The beneficiaries so far as named in this instrument are adults except perhaps the great grandson.

Defendant replies by pointing to subdivision 2 of section 857 of said code, under the title "Uses and Trusts," which section at all times here involved, in this connection read: "Express trusts may be created for any of the following purposes: . . . 2. To mortgage or lease real property for the benefit of annuitants, or devisees or legatees, or other beneficiaries, or for the purpose of satisfying any charge thereon."

Plaintiff rejoins by citing the fact that these three sections were taken almost *in toto* from sections 37, 38 and 55 of the Revised Statutes of the state of New York (Rev. Stats., 1st ed., pp. 726, 728), and points to the case of *Hascall* v. *King,* 162 N. Y. 134 [76 Am. St. Rep. 302, 56 N. E. 515], decided in the year 1900, where these sections are considered and interpreted so as to compel the conclusion that the instrument before us is void. Defendant, practically admitting the action of the New York court, rallies and replies that when our code sections on the subject were adopted the case of *Parks* v. *Parks,* 9 Paige (N. Y.), 111, later affirmed by the Court of Errors, gave the authoritative and contrary interpretation of these sections of the New York statutes and that, under the ruling laid down in *Estate of Potter,* 188 Cal. 68 [204 Pac. 826], to the effect that where a statute is borrowed from another state, it should be given the construction placed upon it by the highest court of that state, we must presume that our legislature intended to adopt the then and not the later interpretation of them. Lastly, defendant insists that our own court in *In re Dolan,* 79 Cal. 65 [21 Pac. 545], settled the question in accord with its contention.

If the language of subdivision 2 of said section 857 of the Civil Code to the effect that an express trust "may be created . . . to . . . lease real property . . . for the purpose of satisfying any charge thereon" is given its ordinary meaning, it follows that an exception is thereby created to the rule prohibiting the accumulation of incomes declared by said sections 723 and 724. It will be noted that this proviso restricts the trust to one to satisfy liens on the property itself and does not purport to grant power to create a trust to mortgage or lease one piece of property to provide income for the purpose of satisfying liens upon another specific property as was the case in part at least in *Hascall* v. *King, supra.* In other words, the apparent intent of section 857, subdivision 2, was to create an exception in favor of a conveyance in trust when made for the sole purpose of satisfying liens upon property, the subject thereof.

That this was the legislative intent appears persuasively from a reference to the English enactment in 1800 of the Statute of 39 and 40, George III, chapter 98, commonly called the Thelusson Act, wherein provisions may be found similar to our sections 723, 724, 725 and 857 of the Civil Code, but

wherein it is noted that a trust to convey, mortgage or lease property may be made for the accumulation of income to discharge the "debts of the grantor, settler, testator or other person or persons." This proviso was omitted from sections 37, 38 and 55 of the Revised Statutes of New York and a provision substantially the same as the one here under consideration was substituted therefor, California having followed New York in this respect. This is some evidence at least of the legislative intent to so narrow the English provision as to confine it to a trust for the satisfaction of liens alone upon the property itself. We realize that in the later case of *Hascall* v. *King, supra,* an attempt was made to give the word "lease" in this connection a different significance than that word ordinarily has. But the reasoning employed is difficult to follow and to our minds is unsatisfactory. It is explained there by a quotation from *Cowen* v. *Rinaldo,* 82 Hun, 479–485 [31 N. Y. Supp. 554, 557], as follows:

"The evident intention of the statute was the creation of a trust to sell land and receive the proceeds thereof for the benefit of creditors, or for the benefit of legatees, or for the purpose of satisfying any charge thereon, to mortgage land and receive the proceeds thereof for the benefit of legatees or for the purpose of satisfying any charge thereon, and to lease lands for a given sum which the trustee is to receive for the benefit of legatees, or for the purpose of satisfying any charge on said land, the fee of the land descending."

How leasing the property for a given term at a fixed definite lump amount and using the fund to discharge a lien on the property is any less a violation than a lease upon periodical payments and the application of the payments as made to a *pro tanto* discharge of the lien is hard to discern, as the transactions are in legal effect the same. We are more content with the reasoning of *Parks* v. *Parks, supra,* on this subject and, as counsel points out, this was the latest expression of the New York court on the subject at the time of the adoption of our code. In that cause it is said: "The revised statutes also have authorized the creation of an express trust to lease lands for the purpose of satisfying a charge thereon. The authority of the trustee, therefore, to pay the interest of the incumbrances out of the rents and

profits of these lots in the first place, and to apply so much of those rents and profits as might be spared from the support of the *cestui que trust*, to reduce the principal of the incumbrance of their respective lots, was therefore valid; . . . ''

This interpretation was followed in *In re Dolan, supra,* where at page 67 of 79 Cal., it is said: ''As we read the will, it gave the property to Michael Dolan in trust to collect and receive the rents and profits thereof, and to use them,— 1. To pay the mortgage on the property; 2. To pay the legacies to Celia Jordan and Margaret Platt; 3. To pay the legacy to Sister Frances McEnnis; and 4. To pay all the residue thereof to James Dolan during his natural life. This was an express trust, and was authorized by law.''

We are satisfied that the court in the Dolan case had the question here considered squarely before it. It is true that it did not receive extended discussion, but nevertheless it was there involved. Said case was decided in 1889 and for a period of forty years that doctrine has been a fixed rule of property in this state. We are, therefore, satisfied with the pronouncement of that case and from it and the other considerations we conclude that the trust before us was not void upon the ground urged and here considered.

Moreover, even the case of *Hascall* v. *King, supra,* 162 N. Y. 134, recognizes that in an action of this character the entire trust should not be held void because of this provision, were its invalidity conceded, for in referring to the facts of that case, the following language is there used: ''That rule is applicable to this situation and should govern it. The primary object of this testator, by the creation of this trust, was to provide an income for his wife, the accumulation for the purpose of paying the mortgages being secondary. Indeed, nothing was to be applied in payment of the mortgages until after the sum named by the testator should in each year be paid in full to his wife, the disposition of the balance being a mere ulterior contingent direction, entirely distinct from the primary trust. That being so, the former is separable from the primary trust and will not be allowed to invalidate it, and, after the purposes of the primary trust have been satisfied, the surplus income must be distributed among those entitled to the next eventful estate.'' The above

doctrine has uniformly met with approval in this state. *Estate of Yates,* 170 Cal. 254 [149 Pac. 555]; *Estate of Duffill,* 180 Cal. 748 [183 Pac. 337], and perhaps other cases.

The primary purpose of the trust before us is to make a testamentary disposition of the property while reserving to the settlers a life enjoyment of the net income. If the provision respecting accumulation of income were to be held void, the provisions of section 733 of the Civil Code would attach and the income would go to the "persons presumptively entitled to the next eventual interest." It should be noted, although without effect here, that the legislature of 1929 (Stats. 1929, p. 276) has amended section 724 of the Civil Code to extend rather than curtail the doctrine of accumulation of income.

We also deem it our duty to express our conclusion upon the challenge of defendant to the sufficiency of the evidence as it now stands to support the general and special verdicts and the decree thereon rescinding said instrument as to Caroline L. Hutchins at the instance of her personal representative. The showing of undue influence and coercion is exceptionally weak and even if its sufficiency as an original proposition be assumed, the evidence of ratification of the instrument after the effect of the undue influence and coercion had abated by the death of her husband, is overwhelming and uncontradicted.

These spouses were of equal age, both being born in 1833. They were at all times herein advanced in years, feeble in step but vigorous in mind. The property in question was acquired in 1905 and was community property. The parties at about the time in question were possessed of several other pieces of property. They had three adult sons surviving and a great grandson and perhaps other lineal descendants. They made a series of five trusts similar in character to the one above described, disposing of all their property upon the plan of retaining life estates in themselves, with remainders over to others, principally their children. During a period of about four years next prior to the execution of the instrument in question, this so-called testamentary trust method of disposition of their property was the subject of repeated discussion between them. The husband espoused the plan of executing the said trust; the wife opposed it. The husband

admittedly had no object in deceiving his wife in any way. Attorneys were consulted. The opposition of the wife persisted and was openly and freely expressed. When the instrument in question was drafted she admittedly understood its contents but was opposed to its execution. She nevertheless did execute it upon the day it bears date. But her state of mind was disclosed to the attorney and the document was not delivered to the trustee until March 19, 1914, nor until she had upon that date joined with her husband in executing a separate instrument requesting the attorney, Mr. E. E. Millikin, to deliver said trust document to the defendant ''so that the same shall immediately upon said delivery being made become fully operative according to its terms.'' Mr. Millikin consulted with her privately and we see no reason why he may not have appropriately advised both her husband and herself.

She had, however, theretofore, and on February 24, 1914, addressed a letter to the trustee and secretly delivered it to one of her sons, in which she recited that she had signed said trust deed ''under force and duress and severe threats'' and which ended with the following words: ''I shall, if I outlive John S. Hutchins, fight this deed to my utmost.'' In her oral testimony she freely admitted concealing her true state of mind from her husband and described in detail the special precautions she took to keep him in ignorance of the fact that she had not in reality changed her views on the subject.

The only threat employed by the husband was that he would separate the community property, giving her her one-half and disposing separately of his one-half. How this can be called a threat, we do not see, as it would not have been an act against her interest. Indeed, the execution of the deed in question was not in derogation of any present interest in the property, as she had none, but on the contrary, by the terms of the instrument she acquired an interest in the property. The most that could be said of the situation is that she was induced to make a testamentary disposition of one-half of the community property in a way and manner she might not have later approved of. Whether this creates a cause of action in her personal representative, we need not pause to learn. She, according to her own testimony,

after 1914 continued to act so as to seem at least to ratify this conveyance.

For example, on January 14, 1916, she executed a writing addressed ''To whom it may concern,'' reciting in part the following: ''I have freely, voluntarily and willingly joined with my said husband in the execution of various trust indentures, wherein we conveyed various parcels of our property in trust for the use and benefit of our children, retaining to ourselves a life estate in the property so conveyed, for the purpose of voiding the delay, expense and annoyance of probating upon our estate.'' Then after further reciting that she fully understood the contents and legal effect of all such trust indentures and deeds, the instrument ended with these words: ''I join therein freely, voluntarily, and for the purpose of accomplishing the ends set forth in each trust deed which I have signed. I thoroughly approve of the course my husband and I have taken, and requested that it be accomplished in the manner in which it was done.''

Upon being questioned about this writing, she said she was sick and signed it although she knew it contained a ''big lie.'' Before her husband's death in 1919, she signed another writing with him addressed to the trustee directing that during the remainder of her husband's life, it pay the whole of the income of said trust to her. She had also theretofore. joined in establishing a joint account with him at defendant bank. She knew fully the contents of the conveyance. She admitted having a copy of it and having read and studied it often. While it undoubtedly is a fact that the true state of her mind is a debatable proposition, at the same time, the evidence of coercion or undue influence is unsatisfactory. Besides, she allowed her husband to die in the belief that he had made a testamentary disposition of their property satisfactory in every way to her. Had he known her state of mind was in fact as she later testified it to have been, he doubtless would have altered his last will accordingly. She left a will preferring two of her sons and excluding the other beneficiaries under the trust. We thus have some of the beneficiaries put to a disadvantage by reason of a state of mind on her part concealed by her from her husband. There is no evidence in the record of a substantial character that shows that she was in anywise afraid at any time to speak

her mind upon this subject and she freely did so. We see nothing that really reflects upon the honesty of purpose or upon the soundness of the judgment of John S. Hutchins.

But we need not dwell further upon this branch of the case nor base our conclusion on it, for said Caroline L. Hutchins lived until June 27, 1923, and during the excess of her span of life over that of her husband, a period of four years, she received and accepted the fruits of this trust, accepting thereunder the sum of $10,895.68, and she must be held to have ratified its terms. She signed vouchers for the payments thereunder and gave directions to the trustee with respect to the monthly sums desired by her from said funds. For example, on August 1, 1919, which was some three months after the death of her husband, she addressed a letter to the trustee referring to the trust conveyance and to the fact that it provided for a quarterly payment to her of $900, or such lesser sum as she might in writing elect to accept, and advised the trustee that she elected to accept $150 per month to be paid monthly and to continue until she notified it in writing of her election to accept some other sum or to accept the full amount provided for under the terms of the trust. On June 8, 1921, she wrote a similar letter requesting $250 per month and by a letter dated November 25, 1922, she directed the payment to her of $300 per month. During all this period of time she was under no possible duress or compulsion. Indeed, on April 5, 1923, she for the first time gave notice of rescission and filed a suit in the Superior Court of Los Angeles County against said trustee, seeking to quiet title to the whole of the property, the subject of this trust, and to rescind said agreement. A nonsuit was granted in this case on November 26, 1923. No reason appears why the suit might not at least have been started soon after the death of John S. Hutchins, which occurred on May 7, 1919. These acts, with full knowledge of the terms and conditions of the trust, are unmistakable evidences of ratification and the record presents no showing whatsoever to counteract their force. (*Bancroft* v. *Woodward*, 183 Cal. 99 [190 Pac. 445] ; *Matteson* v. *Wagoner*, 147 Cal. 739 [82 Pac. 436] ; *Montgomery* v. *Laury*, 143 Cal. 83 [76 Pac. 964] ; *Harrington* v. *Paterson*, 124 Cal. 542 [57 Pac. 476] ; *Ruhl* v. *Mott*, 120 Cal. 668 [53 Pac. 304].)

For these several reasons the appeal of defendant trustee must be sustained and the judgment reversed, and it is so ordered.

Curtis, J., Richards, J., Seawell, J., and Waste, C. J., concurred.