[Sup. Ct. No. 284138. Appellate Department, Superior Court, Los Angeles County.—January 8, 1930.]

LIVE OAK CEMETERY ASSOCIATION (a Corporation), Respondent, v. VICTOR ADAMSON et al., Appellants.

[1 Cal. Supp. 13.]

Bert L. Cooper and Reeve Hobbie for Appellants.

Robert H. Dunlap for Respondent.

BISHOP, ▮ Plaintiff obtained judgment against the appealing defendants on their liability as stockholders of the Victor Adamson Productions, Inc. By way of defense appellants lay the ax to two roots of plaintiff's case. How successfully they cut must be determined from an examination of the judgment-roll, for there is no objection to the sufficiency of the evidence appearing in the bill of exceptions, and we must assume, therefore, that there is ample evidence to support each finding. (*Millar* v. *Millar*, [1917] 175 Cal. 797 [Ann. Cas. 1918E, 184, L. R. A. 1918B, 415, 167 Pac. 394] ; *Jones* v. *Wickstrom*, [1928] 92 Cal. App. 292 [268 Pac. 449].)

First of all, it is insisted that an action for money had and received will not lie in a case where, as here, the money

expended was embezzled. To have the problem properly before us we must see the picture portrayed by the findings of fact.

One A. B. Watson was, from October 1, 1927, on through the story, the president of the plaintiff corporation. He was also president of the Victor Adamson Productions, Inc., part of that time, and all of the time an officer in charge of the books and records. Watson had still a third interest, the Foothill Cities Audit Company, under which fictitious name he carried on an accounting business. Each of the three concerns named had checking accounts in two banks in Monrovia, and Watson kept all the books.

The plaintiff corporation had a fund set aside for the perpetual care of the graves in its cemetery. From this special fund, between September 23, 1927, and June 25, 1928, Watson drew out by checks the sum of $22,175. This sum he mingled with the moneys of his audit company in his two accounts. The income of his audit company during the years 1927 and 1928, not taking into consideration the embezzled money, was $30,830.61. The expenditures of the audit company, not including those for the Adamson company about to be mentioned, exceeded $23,000.

Between September and June Watson drew on his audit company accounts for $29,720.35 and either paid bills for the benefit of the Adamson company or deposited the moneys in one or the other of its accounts, the withdrawals then being made in the corporation's interests. The figure just given includes the sum of $4,500 which went to pay the individual notes of Watson and two others, the proceeds of the notes having been credited to the Adamson company account. A little over $5,000 was returned by the Adamson company to Watson during this time.

Plaintiff's books show that Watson was charged with the sums withdrawn. The books of the Adamson company show Watson credited with the expenditures he made on its behalf. No one in the Adamson company except Watson himself knew that plaintiff's money was being used. Indeed, they were told by Watson and innocently believed that it was Watson's own funds he was advancing. No money went directly from plaintiff to the Adamson company nor to its account, and it is not possible to trace any specific

withdrawal from plaintiff's fund to where it finally benefited the Adamson company.

Does this state of facts create a liability on the part of the Adamson company to the plaintiff? In supporting an affirmative answer, plaintiff advances two theories.

First, it takes the position that from out the transaction the Adamson company emerges in debt to Watson; Watson holds the debt in trust for the plaintiff; as the beneficiary the plaintiff may sue directly. The position seems to us untenable in this case. In the first place, the action at bar is one for money had and received, not one predicated on acts establishing a trust for the benefit of the plaintiff.

Then, too, the relation suggested between the plaintiff and the Adamson company is plainly not a legal one, but one to be created by a decree directed by a court with equity jurisdiction. At the time this action was tried the municipal court had no jurisdiction to decide that Watson should hold his debt in trust for the plaintiff. (Const., art. VI, sec. 11.) Furthermore, a judgment so decreeing would not be in any way binding upon Watson as he is not a party to the action, and would have to be reversed for that reason. See *Hutchins* v. *Security Trust & Savings Bank*, (1929) 208 Cal. 463 [65 A. L. R. 1059, 281 Pac. 1026], and cases cited, for a discussion of this principle.

Plaintiff's second theory is that the Adamson corporation is liable on an implied contract. This is presented by the pleadings and is tenable. The principle involved is illustrated by *Gray* v. *Huffaker*, (1917) 176 Cal. 516 [169 Pac. 1038]. In this case moneys of Gray entrusted to Mr. Huffaker were by him used to pay off a note executed by Huffaker and his wife, secured by a mortgage on her separate property. This use of Gray's money was made with her knowledge. An action for money had and received resulted in judgment for Gray. The court said:

"Upon these facts the plaintiff was entitled to judgment for the money of Gray so appropriated to the use of the defendants. . . . She received a benefit from his money to the same extent as if she herself had received the money and had applied it to pay the mortgage debt. (*Standish* v. *Babcock*, 52 N. J. Eq. 628 [29 Atl. 327].)"

In the case at bar, at least some of plaintiff's money was used to meet bills of the Adamson company. It received a

benefit to the same extent as though it had received the money directly and had applied it to its obligations. The question remains: Was this done with its knowledge?

It is plain, from the findings of fact, that the only knowledge that can be said to be the Adamson company's is that possessed by Watson. Under the circumstances, his knowledge is that of the Adamson company.

The question presented in the case of *McKenney* v. *Ellsworth*, (1913) 165 Cal. 326 [132 Pac. 75], was whether or not the bank, for which plaintiff was receiver, had taken the note being sued on with knowledge that $5,000 had been paid on it. The payee of the note as executed was one Dennis. The statement of the court pertinent to our inquiry follows:

"Dennis was president of the bank, and the only notice to the bank is that which, as respondent asserts, is to be imputed to it by reason of the fact that its president, Dennis, had knowledge of the payment and offset. The familiar rule that a principal is bound by the knowledge of his agent, acquired in the course of the agency, rests upon the presumption that the agent will communicate to the principal the facts learned by him, as it is his duty to do. But, says the appellant, where an agent of a corporation is dealing with the corporation in a transaction in his own behalf, it will not be presumed that he will communicate to his principal facts affecting the transaction. (*Commercial Bank* v. *Burgwyn,* 110 N. C. 267 [17 L. R. A. 326, 14 S. E. 623]; *McDonald* v. *Randall,* 139 Cal. 246 [72 Pac. 997].) This is no doubt the general rule regarding the imputing to a principal of notice of facts known to an agent who is, in the particular transaction in question, acting in an interest adverse to that of his principal. But the rule is not without exceptions. If the agent is in fact acting for his principal in the transaction, even though he may have an opposing personal interest, 'it is his duty, notwithstanding his interest, to communicate to his company (principal) any facts in his possession, material to the transaction, and the law will therefore presume, in favor of third persons, that he made such communication.' (*Bank of Pittsburg* v. *Whitehead,* 36 Am. Dec. 186, note; *Le Duc* v. *Moore,* 111 N. C. 516 [15 S. E. 888].)"

"Usually this is a conclusive presumption." (*Offeman v. Robertson-Cole Studios,* (1926) 80 Cal. App. 1, 12 [251 Pac. 830, 835].)

This case seems to us to be controlling in the situation here. Watson was part of the time the president of the Adamson company, part of the time its secretary, and at all times an officer and in charge of the books and records of the corporation. These facts of themselves are not determinative, however. But it would seem to be the fact, and on the retrial the matter can be definitely determined, that he was left largely in charge of the fiscal affairs of the company. As such he, it seems, obtained the money to pay its bills and keep it going. He was then not only loaning money he had converted to his own account to the Adamson company, but he was entrusted with the duty of securing the funds. He was the company's agent, then, and his knowledge that so much of the money as was actually that of the plaintiff was not his own is knowledge of the company. (See, also, *First Nat. Bank* v. *Reed,* (1926) 198 Cal. 252 [244 Pac. 368]; *Los Angeles Investment Co.* v. *Home Savings Bank,* (1919) 180 Cal. 601, 606 [5 A. L. R. 1193, 182 Pac. 293]; *Williams* v. *Hasshagen,* (1913) 166 Cal. 386 [137 Pac. 9]; *Offeman* v. *Robertson-Cole Studios,* (1926) *supra; Southern T. & C. Bank* v. *San Diego Savings Bank,* (1922) 60 Cal. App. 215 [212 Pac. 385].)

Nor is it material that Watson was acting under no express authorization, if it be found that he was in fact the agent of the company with respect to getting its bills paid. *National Bank of San Mateo* v. *Whitney,* (1919) 181 Cal. 202, presents a closely analogous case.

Our conclusion, then, is that if on a retrial of this action it appears that Watson was entrusted with securing funds for the Adamson company, or paying its bills, that his knowledge that the funds he secured or used were those of the plaintiff brings that knowledge home to the Adamson company.

Under the facts now appearing, however, a judgment in the amount given is without warrant. To begin with, under no theory suggested to us or conjured up by our imagination can the payment of the notes, amounting to $4,500, which "were never the liabilities of the Adamson Co.," be said to be for the benefit of the company, or to

create any liability on the company. Unless, on a retrial of this cause, the Adamson company should be shown to have some legal obligation respecting the notes of Watson, Keefe and Wilson, the payment of those notes should not be taken into consideration.

It would seem, furthermore, that some of the advances made by Watson were from his personal funds (of the audit company) and not from moneys purloined from plaintiff. The following quotation from *Elizalde* v. *Elizalde,* (1902) 137 Cal. 634 [66 Pac. 369, 70 Pac. 861]; gives the rule to be applied (at page 641):

"If the trustee, after so mingling the funds, has drawn therefrom from time to time, it will be presumed that the moneys so drawn were from his own portion of the fund, rather than from the moneys held by him in trust. (*In re Hallett's Estate,* L. R. 13 Ch. Div. 696; *National Bank* v. *Insurance Co.,* 104 U. S. 54 [26 L. Ed. 693]; Lewin on Trusts, *895.) So long as the amount in the fund is greater than the amount of the trust fund it will, in the absence of any showing to the contrary, be presumed to be that held in trust. Whether the moneys are mingled in one account at a bank or kept together in the strong box of the trustee is immaterial."

Upon a retrial it will be necessary, if plaintiff is to succeed, to show that moneys withdrawn from one or the other of the audit company accounts was not Watson's, tested by the rule just given. Only such expenditures for the Adamson company's benefit as were made after all of Watson's own funds were exhausted in the account drawn upon, can be charged to the Adamson company and through it to its stockholders.

Another major attack upon the judgment is made and of itself requires a reversal. This has to do with the premise upon which the case is founded, that defendants are stockholders. They are not and never were stockholders, they defend, because the stock purported to be issued them was unauthorized.

The irregularity on which they rely is accurately set forth in an amendment to their answer. Nowhere did the trial court find that the several allegations of the amendment were or were not true, but by way of what seems to be a

recital of the evidence it is made to appear that the Adamson company was authorized to issue stock upon these terms.

"(1) Thirty shares for cash, at the rate of $1.00 per share.

"(2) 5,000 shares in part payment for certain items of personal property to be transferred by Victor Adamson, one of the promoters of said Adamson Co., free and clear of all liens and encumbrances of all kinds and descriptions, consisting of various kinds of equipment suitable for the production of motion pictures.

"(3) And after the Adamson Co. shall have received the consideration of for and issued said 5030 shares of stock, to sell and issue to the public, 24,470 shares of stock at and for a price of $1.00 per share."

As set up in the answer, the permit referred with more definiteness to the personal property to be conveyed than would appear from the permit given in the findings, and the answer with definiteness avers that the property was not conveyed. Nowhere in the findings is there any reference whatever to the issue thus raised by the answer. In the conclusions of law, however, this statement appears:

"V. (a)

"That the terms of the permit of the Corporation Commission with reference to the issue of the Adamson Co. stock were not complied with in that . . . Victor Adamson did not transfer to Adamson Co. all of the items of personal property which, by the terms of said permit, he was required to transfer as conditions precedent to the issuance of stock to him."

While this is a mixed finding of fact and conclusion of law, it is a finding of fact on the proposition presented by defendant; and it does appear that the Adamson corporation did not receive the consideration for the 5,000 shares of stock it was authorized to issue to Adamson, and that it was the court's conclusion that the giving of the consideration was a condition precedent to the issue of the stock.

But if this be so, the Adamson company was without authority to issue any shares to the defendants, for additional shares could be issued only (as stated in the permit), "after the Adamson Co. shall have received the considera-

tion of for (*sic*) and issued said 5030 shares of stock.'' The conclusion to reach in the premises cannot be in doubt, in view of the authorities.

To begin with, the Corporate Securities Act (Deering's General Laws, Act 3814) provides in section 12 thereof:

''Every security issued by any company, without a permit of the commissioner authorizing the same then in effect, shall be void. . . .''

Stock issued where no permit has been granted at all has been declared to be void, and the person to whom the stock was issued was not liable as a stockholder, for ''the corporation having no legal rights against Reno, its creditors could have none.'' (*Honn* v. *Hamer*, [1927] 81 Cal. App. 276 [253 Pac. 336].) Just as clearly within the characterization of section 12, it seems to us, must be placed stock issued after a permit has been granted, but which finds no authority for its issuance in the permit. Such stock is void, for it is issued without a permit authorizing it.

On yet another principle, it seems to us, the stock issued to defendants before the Adamson company received the consideration for the 5,000 shares is void. This principle finds expression in *Smith* v. *Bach*, (1920) 183 Cal. 259 [191 Pac. 14], as follows:

''The general rule controlling in cases of this character is that where a statute prohibits or attaches a penalty to the doing of an act, the act is void, and this, notwithstanding that the statute does not expressly pronounce it so. . . .''

Section 13 of the Corporate Securities Act reads in part:

''Every company which shall . . . issue . . . any . . . security . . . in nonconformity with a permit of the commissioner authorizing the same . . . shall be guilty of a public offense. . . .''

Accordingly, it is held that a contract to purchase stock, not conforming to the terms of a permit, is void. (*Gridley* v. *Tilson*, (1927) 202 Cal. 748 [262 Pac. 322]; *Domenigoni* v. *Imperial Live Stock etc. Co.*, (1922) 189 Cal. 467 [209 Pac. 36]; *Otten* v. *Riesener Chocolate Co.*, (1927) 82 Cal. App. 83 [254 Pac. 942].)

In the Otten case the court says it is holding the contract for the purchase void, and is not declaring the stock to be void as that question is not involved. *Brewis* v. *Toffelmier*, (1929) 97 Cal. App. 329 [275 Pac. 819], deals

with a case much like the Otten case as far as the issue of stock is concerned (in each the violation complained of was the failure to exhibit a copy of the permit) and the court makes a distinction between those cases where there is no stock, because there is no permit authorizing its issue, and the case before it. We find in the opinion: "His stock is not something that does not exist, as in the other case, but is properly issued even if not properly delivered. . . ." Without pausing to examine the latter statement too critically, we find the stock in our case not properly issued, because issued prior to the event upon which its authorization was conditioned.

The conclusion is ineluctable, that as now appears the defendants are not stockholders and judgment should not have gone against them.

The judgment is reversed, appellants to recover their costs on appeal.

Doran, J., *pro tem.*, concurred.

McCOMB, Acting P. J., concurring.—I concur in the result, basing my decision upon the grounds first stated in the opinion.

Rehearing denied.