OPINION. Hill, Judge: The first question is whether by virtue of the promotional shares petitioners realized income in 1939 rather than 1940. Since the instant proceeding involves only 1940 a determination that the income, if any, was realized in 1939 would dispose of the cases. Petitioners earnestly contend that they acquired a proprietary interest in the company in 1939 which rendered them taxable, if at all, in 1939 rather than in 1940. Petitioners argue that the public sales Which determined the amount of their interests were made in 1939 and that by the terms of their contracts with, the company their rights to shares accrued as of the date of such public sales, notwithstanding the date of actual issuance to them. Petitioners further argue, in effect, that at the end of 1939 merely the formality of the Corporation Commissioner’s approval of the escrow agent and the execution of the waivers by petitioners required accomplishment before the issuance of shares to them. We have carefully considered this argument and have concluded that petitioners did not acquire a proprietary interest in the company in 1939. The permit authorizing the company’s stock issue provided that no promotional shares “shall be sold or issued unless and until the applicant [the company] shall have selected an escrow holder and said escrow holder shall have been first approved in writing by the Commissioner of Corporations * * *.” The permit further provided that no promotional shares “shall be sold or issued unless and until * * *” the petitioners “shall have executed an agreement in writing with said applicant and filed a copy thereof with the Commissioner of Corporations” waiving their rights to dividends and distributions of assets. In 1939 the Commissioner of Corporations had not approved in writing the appointment of the escrow agent nor had petitioners executed their waivers. These requirements were clearly conditions precedent to the company’s authority to issue shares. The company’s authority to issue shares or create proprietary interests derives from the state and is not. an inherent corporate power which can be exercised by contract independently of sovereign control. Therefore the company could only bestow proprietary interests on petitioners when and as authorized by the Commissioner of Corporations. Live Oak Cemetery Assn. v. Adamson, 288 Pac. 29. See also Fletcher Cyclopedia Corporations, sec. 5158. A recognition of the distinction between the issuance of certificates and the issuance of shares does not affect our conclusion. Nor does the fact that original subscribers to stock are sometimes regarded as stockholders, even absent an issuance of shares, have application here. We are satisfied that petitioners did not acquire any stock or other proprietary interest in the company in 1939. Petitioners alternatively argue that they constructively received a stock or proprietary interest in 1939. From what we have already said, it is apparent that the theory of constructive receipt can have no application in the instant situation. Although not explicitly argued, it seems to us that petitioners’ position perhaps unconsciously involves a reliance upon the equivalent of cash theory. We have therefore considered the possible application of this theory to the instant situation and have rejected it. It is undoubtedly true that petitioners had a contract right of value. They had fully rendered their considerations, i. e., past promotional services, entering employment contracts, and so on. The company was obliged to issue certain shares to petitioners, subject, of course, to the limitations and requirements imposed hy the Commissioner of Corporations. The company was at least impliedly required under its contracts with petitionérs to comply with these limitations and requirements. That these obligations or duties of the company or the correlative contract rights of the petitioners had value is witnessed by the Ellsworth-Smith transfer described in the facts. Nevertheless, we do not think that petitioners accepted these contract rights as payment. The written contracts were merely evidence of the company’s undertaking and, while undoubtedly valuable and transferable with the Corporation Commissioner’s permission, they were not given or accepted as payment. Unless the company’s obligation as evidenced by the written contracts with petitioners was accepted by them as payment, we do not think such evidenced obligations can be considered the equivalent of cash, even though valuable in the hands of a cash-basis taxpayer. San Jacinto Life Insurance Co., 34 B. T.-A. 186; Frank Kuhn, 34 B. T. A. 274; Great Southern Life Insurance Co., 33 B. T. A. 512; affd., 89 Fed. (2d) 54; certiorari denied, 302 U. S. 698; Schlemmer v. United States, 94 Fed. (2d) 77. It is pertinent in this connection to note that section 22 (a), Internal Revenue Code, defines as gross income, inter cilia, “compensation for personal services * * * of whatever kind and in whatever form paid * * (Italics supplied.) While contract rights under certain circumstances can be considered the equivalent of cash, we do not think the instant situation is properly susceptible to such treatment. Nor, as indicated above, do we think such contract right should he confused with a proprietary interest in the company. We therefore conclude that petitioners did not realize income in 1939 by virtue of their situation with respect to the promotional shares in question. Having determined that any income realized on account of the promotional shares was not realized in 1939, it becomes necessary to determine the value of the promotional shares as of March 4,1940. The petitioners concede on brief that, if 1939 is not the income year, then March 4, 1940, becomes the crucial date, being the date when the promotional shares were issued to petitioners and the certificates therefor placed in escrow. Respondent has determined that each share of promotional stock, classes A and B alike, was worth $6.25. This value was apparently, based largely on the price for which the unrestricted class A shares sold for in 1940. Petitioners, on the other hand, contend that the promotional stock had no value as of March 4,1940. We have found as a fact that each share of promotional stock, classes A and B alike, was worth $4 as of March 4,1940. We have treated class A and class B promotional shares as equivalents in making our evaluation. We have done this for convenience and simplicity, because the parties approach the problem in this manner and because as a practical matter- the limitations imposed on the promotional stock virtually eliminated any distinction between the two classes of stock. The company’s option to repurchase the promotional class B stock for 25 cents a share seems to us to have little significance for evaluation purposes, because the petitioners were the directors of the company and, further, had they exercised such an option for the company the result would have been to increase the value of the class A shares. Nor does the junior position of the class B shares have significance with respect to the promotional shares, since petitioners had to waive all their rights to any dividends and distributions of assets. Nor does the provision calling for the cancellation of class B shares at the end of the 5-year period, if they failed to become convertible, have significance with respect to the promotional shares, because if they failed to become convertible it would mean that there had been no adjusted net profits and therefore the promotional class A shares would have remained in escrow, subject to the waivers. In other words, it seems to us that with respect to the promotional shares the distinction between class A and class B was essentially eliminated by the restrictions imposed and, in practical operation, if the class A shares had any value the class B shares directly or indirectly acquired an equivalent value. For these reasons we feel warranted in treating them for evaluation purposes as equivalents. We do not think respondent’s evaluation can be sustained. The unrestricted class A stock sold during 1940 at a high of $8 and a low of $5, or at a mean average of $6.50. Respondent’s determination of $6.25 for the promotional shares, we think, too closely approximates the value of the unrestricted shares and fails to give sufficient recognition to the restrictions imposed on the promotional shares in question. We think that the Ellsworth-Smith transfer furnishes the best available indication of the approximate value of the promotional shares, and this transfer indicates an approximate value of $4.50 a share. It is true, as petitioners suggest, that this transfer was a somewhat isolated transaction, but, nonetheless, we think it offers a reliable approximation of válue. We have found a value slightly less than the value indicated by the Ellsworth-Smith transaction. In so doing we have given consideration and effect to such factors as the managerial relationship of petitioners to the company, the large block represented by the shares in question, and the unproven position of the company as compared with its more seasoned competitors. After a very careful consideration of these factors, in addition to all the other pertinent evidence bearing on value, we have concluded that $4 a share represents the fair value of the promotional stock as of March 4,1940, the crucial date. The remaining question is whether the promotional shares received by petitioner La Motte T. Cohu constituted his separate property or was community property. The answer depends on whether' La Motte was domiciled in California when he acquired the shares. We have found as a fact that La Motte decided to make California his home early in June 1939, and this fact, coupled with his presence in California and the other attendant circumstances of the situation, satisfies us that he became domiciled in California at that time. We think that, for the purpose of determining the community or separate character of the shares, June 17,1939, is the earliest possible determinative date, being the date La Motte entered the written contract with the company by which the company undertook to issue the promotional shares to him. Since La Motte was domiciled in California prior to this date, it follows that the shares became the community property of La Motte and Didi, and we so hold. Decisions will be entered under Rule 50.