[Civ. No. 12075. Third Dist. Feb. 18, 1970.]

Estate of BERNARD BENTON, Deceased. CHARLES BUSALACCHI, Petitioner and Appellant, v.
PEARL BENTON et al., Claimants and Respondents.

## Counsel

Mazzera, Snyder & DeMartini and Robert A. Haughwout for Petitioner and Appellant.

Darrah & Darrah, Guard C. Darrah and Francis X. Vieira for Claimants and Respondents.

## Opinion

**BRAY, J.**\*—Appellant, Charles Busalacchi, appeals from a judgment determining that Pearl D. Benton, widow of decedent, is the sole heir and beneficiary under decedent's will.

### Questions Presented

1. Effect of nonissue of the stock mentioned in the will.

2. Did the conditions under which testamentary gifts to decedent's daughter and appellant were to vest, occur?

3. Interpretation of the will.

### Record

Jack Bernard Benton died testate on September 13, 1966. His widow, Pearl Benton, duly became executrix of his will. Benton left surviving him his widow and an adult daughter, Betty Jo Pratt. During the administration of the estate, appellant Busalacchi, claiming an interest in the property of the estate, filed a petition to determine interest in estate. The widow, Pearl Benton, filed a statement of interest in which she denied that appellant was entitled to any interest in the estate, claiming for herself all of the property of the estate. Betty Jo, the daughter, also filed a statement of interest in

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

which she denied any interest in the estate in appellant and supported her mother's contention that she alone was entitled to the property of the estate. After a trial the court found against appellant's contentions and adjudged Pearl the sole heir and beneficiary under Benton's will.

## The Will

The solution of the problems in this action depends upon the construction of decedent's will. Before discussing its terms, it is well to consider the relationship of appellant to the Bentons. (There was no blood or adoptive relationship.)

Decedent was a developer and operator of two boat marinas in the Stockton area (Benton's Anchorage at Buckley Cove and the Delta Yacht Harbor), a single business which took most of Benton's time. Benton had one child, Betty Jo, who was Mrs. Benton's stepdaughter. Betty Jo had no children. In 1958 Benton first met appellant who was then 15 years old. Appellant was no relation to Benton. Appellant worked for him after school and on weekends in the construction of the marinas. This part-time employment continued during appellant's vacations from college. Appellant graduated in 1964 with a major in business administration. In 1963 Mr. and Mrs. Benton talked generally about incorporating their business, finding a young man to manage it and to produce income for them as they grew older and giving him a stock ownership interest which would progressively increase as Mr. and Mrs. Benton and Betty Jo passed away, until ultimately the business would be all his. That same year Benton told appellant that if he came into the business in the future and worked with him, appellant would receive 25 percent when Benton died, 25 percent when Mrs. Benton died, and the whole business when Betty Jo died.

In 1965 appellant went to work full time for Benton, who treated him as a son and tried to teach him everything Benton knew. Appellant's main activity was construction work at the Anchorage, but he also rented out berths and managed the fuel dock on weekends. Appellant accompanied Benton on numerous trips away from Stockton, including two long vacations in Canada. On other occasions, when Mr. and Mrs. Benton were in Canada, appellant was left in charge of the business.

Formulation of Benton's testamentary plan took place with the aid of attorneys during the period of November 1965 to May 1966. It had two integrated facets—the formation of a corporation (Benton Anchorage, Inc.) and the preparation of reciprocal wills for Mr. and Mrs. Benton. The corporation was created first, its articles of incorporation being filed with the Secretary of State November 24, 1965. Benton acted upon counsel's advice that upon his death Mrs. Benton's ownership of 50 percent of the stock of the

corporation would give her control of the business during her lifetime, in contrast to what her power would be if she were only a copartner with appellant and Betty Jo; hence, the corporate form was essential. The application for a permit to issue stock, and the stock permit itself, specified that in consideration of the transfer of the assets of their two marina properties to the corporation there would be issued 2,500 shares each to Mr. and Mrs. Benton, comprising the total original stock issue of Benton Anchorage, Inc. However, none of the assets of the Delta Yacht Harbor (which was owned by the Bentons outright) or of Benton's Anchorage (which was held by Benton under a long-term lease from the City of Stockton) were ever transferred to the corporation either before or after Benton's death. Stock certificates were never signed or issued.

By the time the corporation was formed, both Mr. and Mrs. Benton had decided that appellant would ultimately manage and take over the business. Mrs. Benton had no experience either in fueling boats or in harbor construction and upkeep, and construction was the most important part of the marina operation. Her business role had been limited to bookkeeping and helping clean up and rent berths. Betty Jo had no experience whatever in the business.

In addition to giving Mrs. Benton control of the corporation when she became widowed, Benton wanted to provide an income for Betty Jo while she lived and to give appellant an income and stock incentive for managing the business so that he and Betty Jo would own all the stock after Mrs. Benton died, with appellant to be sole owner if he survived Betty Jo and was still employed by the corporation. Benton was advised by counsel that to effect these objects Betty Jo would have to agree to make an irrevocable will leaving her shares to appellant, and Betty Jo and appellant would have to agree that each would draw the same income from the corporation. Benton's attorney testified, "There was never any discussion that one could prevent the other one from inheriting by refusing to enter the agreement."

To accomplish the aforesaid purposes, counsel drafted for Mr. and Mrs. Benton reciprocal wills, which were signed on May 18, 1966. Benton's will, which has been admitted to probate, states that his estate consists of community property, revokes all former wills, directs the payment of debts and expenses, appoints his wife executrix and contains an incontestability clause.

The pertinent portions of Benton's will are set forth hereinafter. All of Benton's property is bequeathed, "with the exception of my stock in BENTON ANCHORAGE, INC.," to his wife, and in the event of her death to Betty Jo.

1. Nonissue of the stock.

■ At the time of the execution of the reciprocal wills, the corporation, Benton Anchorage, Inc., had been formed, the organization meeting and the meeting authorizing application to the Commissioner of Corporations for permission to issue 2,500 shares each to Benton and Mrs. Benton were held. As stated above, the stock permit was granted, subject to the condition that the assets of the two marinas be first transferred to the corporation. However, the Benton's Anchorage lease could not be assigned without the city lessors' consent, which was never obtained. The Anchorage was also encumbered by a deed of trust which accelerated the obligation to repay the loan if there was a transfer of ownership without the lender bank's permission. The bank never gave this permission.

Nevertheless, at the time the wills were signed, everyone concerned believed that the marinas had been transferred to the corporation. Benton's attorney had told him that all that was necessary was to have his accountant transfer the marina assets on the books of the corporation. At the time of the signing of the wills, the attorney felt that the transfer of the marina assets had been made to the corporation and so advised the Bentons. The transfer on the books was made. From then on, all of the business was done in the name of the corporation. The bank accounts were in its name. Fire and public liability insurance were carried in the name of the corporation. In January 1966 the attorney sent the Bentons photographs of the unsigned corporate stock certificates, showing 2,500 shares in each. These photocopies were accompanied by a letter in which the attorney told each of them that "a stock dividend [*sic*] of 2,500 shares of capital stock has been declared by Benton Anchorage, Inc., in your favor, and the original certificate is being held in our office as escrowed stock." Benton was elected president, Busalacchi, vice president, and Mrs. Benton, secretary-treasurer, of the corporation Tax returns were filed in its name. All checks were issued in the corporation name.

It is clear from a reading of the will itself and from the extrinsic evidence that Benton's intent was, as he says in subdivision e) of paragraph 5, "to provide that upon my death twenty-five (25%) percent of the *business* shall pass to my daughter and twenty-five (25%) percent to CHARLES BUSALACCHI." (Italics added.) He told his lawyer that he desired to bequeath his *business,* and his lawyer's idea was that the way to do that was to form a corporation and bequeath shares of stock. Since the stock permit was not complied with, Benton owned no shares when he died. (See *Live Oak Cemetery Assn.* v. *Adamson* (1930) 106 Cal.App. Supp. 783, 790-793 [288 P. 29].) The trial court, while making no finding on this subject in its interpretation of the will, treated the situation as if the shares in the corpora-

tion had been issued. It was the intention of both Benton and Mrs. Benton that their wills deal with shares of the business so we must interpret them.

## 2. Interpretation.

The probate court held that it was the intent of the testator under his will that the bequests to Betty Jo and appellant were conditioned upon the *mutual* assumption of the required obligations and that the conditional bequests were inoperative unless each agreed thereto; that one being ready, willing and able and the other unwilling did not meet the requirements of the will and hence vests no rights; that Betty Jo, having refused to execute the agreement referred to in the will, had waived her right to do so and had lost her right to the bequest to her; that it was Benton's intent under his will that if either Betty Jo or appellant declined to enter into the respective agreements, neither would be entitled to share in the estate; and that under such circumstances the entire estate should be distributed to the widow. Judgment was entered accordingly.

Generally, the trial court's interpretation of a will based upon its terms and uncontradicted extrinsic evidence will be followed by the appellate court. However, the appellate court is not absolved from its duty to interpret the instrument, and if the reviewing court finds that the trial court's interpretation is erroneous, the judgment may be reversed. (*Estate of Canfield* (1967) 256 Cal.App.2d 647, 656 [64 Cal.Rptr. 195].) As will hereinafter appear, we determine that the trial court's interpretation is erroneous.

Neither the scrivener of the will, Betty Jo, appellant nor Mrs.' Benton testified that the testator said what he intended should happen to the bequest to one legatee if the other declined to enter into the agreement mentioned in the will. The attorney testified that there was never any discussion that either Betty Jo or Charles could prevent the other from inheriting by merely refusing to sign the agreement. His intention in that regard, if it can be determined at all, will have to be determined from the terms of the will itself and from statements of the testator as to his plans for his three beneficiaries. As to the evidence concerning these plans, there is no conflict.

The trial court well analyzed Benton's plans, saying, "it seems quite clear that the testator's fundamental purpose was to protect and provide for Mrs. Benton and his daughter. . . . [H]e hoped to perpetuate the business in order to provide an assured income for the natural objects of his bounty on his demise, as well as insure also the existence of a substantial marketable asset. In order to accomplish this objective apparently he envisioned the development of a competent young man who, after appropriate training under his supervision, could conduct the business successsfully. [T]he first choice on this general approach was unsuccessful [Betty Jo's husband] and

thereafter, Mr. Benton engaged petitioner, Charles Busalacchi, a young man who developed over a period of time at least sufficiently to afford both Mr. and Mrs. Benton an occasional respite from the manifold duties of the anchorage business. Hopefully, then, Mr. Benton attempted to set up a testamentary arrangement designed to accomplish his primary purpose, providing in the process appropriate inducements for the younger man but with adequate protective safeguards to insure the future of the natural objects of his bounty. . . ."

With this background fully supported by evidence without conflict, the trial court turned to the provisions of the will. In paragraph 4 the testator bequeathed to his wife all his property, detailing much of it, "with the exception of my stock in BENTON ANCHORAGE, INC." On her death the property bequeathed to his wife is to go to Betty Jo. In paragraph 5 the testator declares that he and his wife each own 2,500 shares in the corporation, and that it is the total issue of the corporation's stock. He confirms to his wife her shares as community property. *"Upon the condition that my daughter and* CHARLES BUSALACCHI *execute the written agreement* provided for in subparagraph (c) of this paragraph, I bequeath my shares of stock as follows:

"a) I bequeath 1250 shares to CHARLES BUSALACCHI *upon the condition that he is still employed by* BENTON ANCHORAGE, INC., at the time of death. If he is not so employed, said shares shall pass to my daughter.

"b) The remaining 1250 shares of said stock I bequeath to my daughter, BETTY JO PRATT." (Italics added.)

He then repeats that the bequests to Betty Jo and appellant are conditional upon their executing and delivering to his executor an agreement which shall provide that on his daughter's death her shares shall pass to appellant, provided that he is then employed by the corporation, and if not so employed, that her shares shall go to her heirs, or as she may elect by will. Also, he requires that the daughter shall agree to make an irrevocable will to such effect and deposit it with his executor. The agreement must provide that the income of the business shall be paid equally to the daughter and appellant and that each shall draw the same amount from the corporation whether the disbursements be by wages, salary, dividends or drawings.

In the event of the death of the testator and his wife in a common accident, all the stock of both shall pass to Betty Jo and appellant, again *provided* that the before mentioned agreement is executed so as to apply to *all* of such shares.

Then follows a statement that the purpose of the will is to provide that upon the testator's death 25 percent of the "business" shall pass to Betty Jo and 25 percent to appellant, and that when both Benton and Mrs. Benton

have passed on, Betty Jo and appellant shall each own one-half of the shares of the corporation and that when the daughter dies, Charles is to be the sole shareholder. The testator reiterates the two shall share equally in the income of the business. Mrs. Benton is executing a will to carry out this intention. Nothing shall prevent the sale of the corporation, nor its stock, by the wife, daughter and Charles, provided that all agree and such sale is for the best interest of my estate or of the business.

Should Benton make any gifts or sale of his shares during his lifetime, the terms of the will shall be applicable to any remaining shares in proper proportion.

Then follows the paragraph which causes the problem: "g) In the event that CHARLES BUSALACCHI refuses to execute the agreement provided for herein, his shares shall pass to my daughter. In the event my daughter refuses to execute the agreement provided for herein, her shares shall pass to my heirs at law."

The testator once more repeats the requirement of the execution of the agreement, stating that all bequests to Charles are upon the conditions above set forth, "and upon the further condition that he pay the total inheritance and estate taxes levied upon my estate. The election to make such payment is to be filed in writing with my executrix or executor prior to the distribution to CHARLES BUSALACCHI of his bequest. In the event such payments are in excess of his current ability to pay, a payment on a reasonable term basis shall be arranged with my Executrix or Executor."

To sum up, the will provided that decedent's 2,500 shares of stock were not to go to his wife but to Betty Jo and appellant in equal shares provided that "my daughter and CHARLES BUSLACCHI execute the written agreement," which was to provide that on the death of either the shares willed to the one dying should pass to the other (to appellant only if still employed by the corporation and if he pays the prescribed taxes).

The trial court reasoned that nothing in the will suggests or is susceptible to the construction that the *mutual obligations* of the conditional donees, as required by the explicit terms of the will, were negated or relaxed in any way; that these mutual obligations, containing as they do protective features which the testator considered essential, must be undertaken mutually in any event; and that the testator's intention appears therefrom that the bequests are not effective in the absence of compliance by both Betty Jo and appellant.

The court interpreted the provision which states, in effect, that if either refuses to execute the agreement the bequest to such person fails, as not being in the nature of a penalty depriving the unwilling party of the benefits

otherwise available but in no way disturbing the bequest to the willing party; and that the provision is designed only to designate where the property, the subject of the conditional bequests, should go in the event that the obligations to be provided by both parties in the agreement have not been effected.

The court then stated that the testator's intent was that the bequests were conditioned upon mutual assumption of the required obligations and that since Betty Jo did not agree to assume the required obligations, the bequests to both Betty Jo and appellant fail and the entire estate should be distributed to the widow.

The difficulty with the court's interpretation of the will is threefold: 1. It results in intestacy as to the testator's shares willed to Charles, and, as has been frequently held, an interpretation which will avoid intestacy should be adopted, if possible. (See *Estate of Northcutt* (1940) 16 Cal.2d 683, 690 [107 P.2d 607].) 2. The interpretation giving appellant's shares to the widow violates the rule that "the words of a will are to receive an interpretation which will give every expression some effect, rather than one which will render any expression inoperative." (*Estate of Northcutt, supra,* p. 688.) 3. It gives the widow shares which the testator expressly reserved from his bequests to her. As to Betty Jo's shares, the interpretation, in effect, modifies the reservation from the widow's bequests in the will in that the will provides that on the daughter's refusal to sign the agreement, the shares "shall pass to my heirs at law." The widow is such "heir." A more reasonable interpretation than that made by the court is that Betty Jo's refusal does not affect the bequest of 1,250 shares to appellant, provided he is willing to sign the agreement as outlined and pays the estate and inheritance taxes. This interpretation gives meaning to all the provisions of the will and avoids intestacy as to any of the testator's property.

Appellant claims that in addition to his 1,250 shares, he is entitled to Betty Jo's 1,250 shares, subject only to a life estate therein to her. This would be in violation of the terms of the will in that it provides in the event of refusal to sign that her shares go to her heirs or designee. The attorney who drew the will testified that he told Benton that the daughter's shares could not be tied up so they would eventually go to appellant without her agreement.

Appellant testified that there was no obligation on the part of Mr. or Mrs. Benton to will him any part of their property, that Benton told him that "maybe as a gift" sometime in the future he would receive stock along with Betty Jo and did not promise him that.

Under the will the only penalty resulting from Betty Jo's refusal to sign is her loss of her shares. It does not affect the requirement that she receive from the business the same share of the disbursements by wages, salary,

dividends or wages which Charles receives. All of the extrinsic evidence, as well as statements in the will, demonstrate that the testator intended his daughter to be taken care of in this way.

As we hereinbefore stated, that although he erroneously believed the marina properties had been transferred to the corporation and shares duly issued, it was Benton's intention that the business and its property should be considered divided into one-half in his wife and one-half in himself, and that his half should be divided into halves to go to his daughter and Charles, in other words, one-quarter of the business and property to each. For ease of discussion, we have referred to these interests in the business as shares in the corporation. However, what is meant is fractional interests in the business and its property. It was Benton's intent, as expressed in the will and as shown in the testimony of the attorney who drew the will, that Mrs. Benton, during her lifetime, should have control of the business. Therefore, appellants' share is subject to that control. Mrs. Benton will retain her community one-half interest and under the terms of the will will receive Betty Jo's one-quarter interest. Provided that appellant meets the terms of the will,[1] he will receive a one-quarter interest subject to Mrs. Benton's lifetime control. Betty Jo and appellant will receive one-quarter of the income and "disbursements."

The judgment is reversed and the cause remanded to the probate court to enter judgment in conformance with this opinion.

Pierce, P. J., and Regan, J., concurred.

A petition for a rehearing was denied March 18, 1970, and respondents' petition for a hearing by the Supreme Court was denied April 15, 1970.

---

[1]He has already complied with one term—he was still employed by the corporation at the time of Benton's death.