**Harold E. MacDONALD and Marian B. MacDonald, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 11419.**

United States Court of Appeals Seventh Circuit.

Feb. 13, 1956.

Peter B. Atwood, Chicago, Ill., Walker, Atwood, Zukowski & McFarland, Chicago, Ill., of counsel, for petitioners.

H. Brian Holland, Asst. Atty. Gen., Joseph F. Goetten, Atty., Tax Division, U. S. Dept. of Justice, Washington, D. C., Ellis N. Slack, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before MAJOR, SWAIM and SCHNACKENBERG, Circuit Judges.

MAJOR, Circuit Judge.

This case is here on a petition to review a decision of the Tax Court, entered January 11, 1955, sustaining an asserted deficiency in the income tax of Harold E. MacDonald and Marian B. MacDonald for the taxable year 1949, in the amount of $102,732.30. The Tax Court in sustaining the deficiency as asserted by the Commissioner held that a stock option granted in 1948 by Household Finance Corporation (referred to as Household) to petitioner, Harold E. MacDonald, was compensatory in character and hence taxable when exercised in 1949. The deficiency is predicated upon the spread in the amount of $150,500, which represented the difference between the option price of 10,000 shares of Household's common shares and their market value at the time of the exercise of the option. The option price was $18.70 per share, and the market value on October 4, 1949, the date of the exercise of the option, was $33.75 per share.

The questions for decision are: (1) Did the petitioner MacDonald realize additional income in 1949 in the form of compensation in the amount of $150,500 on the purchase of 10,000 common shares of Household pursuant to an option given to him on May 5, 1948? and (2) If the option granted MacDonald in 1948 was in fact compensatory in character, (a) did MacDonald's oral agreement not to sell the shares acquired on the exercise of the option preclude such shares from having any ascertainable or realizable fair market value? (b) did the restrictions of Section 16(b) of the Securities Exchange Act of 1934, Title 15 U.S.C.A. § 78p (b), preclude the ascertainment of fair market value of the shares so acquired, or the possibility of effectively realizing that value during 1949?

The findings of fact and opinion of the Tax Court are reported at 23 T.C. 227, filed November 10, 1954, to which reference is made so as to obviate a detailed statement of facts which we would otherwise be required to make. Petitioners as husband and wife filed a joint federal income tax return for the taxable year 1949 on a cash basis. Marian B. MacDonald is a party to the proceeding only for that reason, and Harold E. MacDonald will be referred to as taxpayer.

Taxpayer was vice president and a director of Schenley Distillers Corporation from 1944 to 1948. In the spring of 1947, he was approached by B. E. Henderson, an executive officer of Household, regarding his possible employment by the latter. Household was interested in employing an executive of demonstrated ability with the view of making him president of Household. Taxpayer and Henderson met and discussed possible terms of employment. At that time taxpayer was informed that Household would pay him an annual cash salary of $50,000 for the first year, $60,000 for the second, and $75,000 for the third. Taxpayer was also informed at

this first meeting that it was Household's policy that its key executives acquire a proprietary interest in the company.

At that time taxpayer was receiving a base compensation of $50,000 from Schenley. (Commencing December 1, 1947, however, taxpayer received a base compensation at Schenley of $70,000 per annum.) Taxpayer, at Schenley, also was entitled to the benefit of its pension plan and to its Extra Compensation Plan, which entitled him to bonus credits and payments of substantial amounts. In this first meeting, taxpayer pointed out to Henderson that leaving Schenley's employ would result in financial sacrifice as he would forfeit his compensation and pension rights. He therefore was unwilling to enter the employ of Household on the salary basis proposed, in the absence of an additional inducement. Different proposals were discussed, including "the possibility of acquiring stock through a bargain purchase." On August 8, 1947, Henderson wrote to taxpayer to the effect that it was believed arrangements could be made by which taxpayer could acquire substantial holdings in Household at a reduced price and could participate in Household's pension plan. Taxpayer in reply expressed doubt that satisfactory arrangements could be made and informed Henderson that he could not accept the position.

Negotiations were later resumed which culminated in a letter from Henderson to the taxpayer, dated May 5, 1948, which outlined Household's offer. This letter stated:

"The purpose of this offer is to induce you to accept employment as an executive. The offer is conditioned on your accepting such employment and becomes operative only if and when you have done so."

In brief, the offer was to sell taxpayer 10,000 shares of stock at a price between the market value at the time of purchase and the adjusted book value on May 31, 1948, and to lend or extend him credit for the full purchase price. The proposal contained a formula providing for the determination by agreement of the price and number of shares to be purchased by taxpayer. In the absence of such agreement, the formula provided that the same should be determined by arbitration in a manner specifically set forth. It perhaps is material to note that the letter not only offered to lend taxpayer money for the purchase price of stock but also offered to lend him money for the purpose of paying "any federal income taxes for which you become immediately liable at the time of purchase." It may also be pertinent to note that the offer as contained in this letter fixed no time limit on taxpayer's right to purchase stock.

On June 1, 1948, Henderson by letter tendered taxpayer a formal offer of employment at a base salary of $50,000 for the first year, $60,000 for the second and $75,000 for the third. This letter confirmed the so-called option agreement of May 5, 1948. The offer was silent as to the right of either party to terminate the contract other than that during the first year it was terminable by taxpayer on three months' notice and by Household on six months'.

Taxpayer accepted this offer of employment, effective June 15, 1948, and two days later was made executive vice president and a member of the board of directors of Household. In March 1951, he became president of Household. Upon leaving Schenley taxpayer forfeited practically all the deferred compensation credited to him, as well as his rights under its pension plan. The extent or amount of this sacrifice is in considerable dispute and has given rise to the citation of numerous facts and figures which we think need not be set forth. We assume what we think is clearly shown, that is, that the monetary sacrifice sustained by taxpayer in changing his employment was substantial. At any rate, such undoubtedly was the case, absent any benefit inuring to taxpayer by reason of his right to purchase stock at a bargain price.

On October 4, 1949, taxpayer exercised the stock option previously granted

to him. Such exercise was acknowledged by Household's letter to MacDonald under the same date, which stated:

"On May 5, 1948, this Company offered to sell you up to 10,000 shares of its common stock on certain terms and conditions, as an inducement to enter its employ. On June 14, 1948, you accepted employment by this Company and its offer to sell you stock became operative."

The letter further recited an agreement between the parties for sale of 10,000 shares at $18.75 per share, the purchase price to be loaned to the taxpayer by Household Consumer Discount Company, a subsidiary of Household, on taxpayer's promissory note. The letter recited the delivery of the shares and the receipt of taxpayer's promissory note in the amount of $187,000, as payment therefor. The note provided that dividends on the shares should be applied to the payment of the principal. The note bore no interest for a period of fifteen years; after that, at the rate of 4% on any unpaid principal.

The common stock of Household had been continuously listed on the New York Stock Exchange since sometime prior to 1948. The record shows the fair market value of such shares on numerous dates but, in view of the situation as it has developed, we think the only material date is October 4, 1949 (date of exercise of option), when its fair market value on the New York Stock Exchange was $33.75 per share. This market price does not take into consideration or give effect to any restrictions placed upon taxpayer's right to sell such shares by reason of Sec. 16(b) of the Securities Exchange Act of 1934. There was an oral agreement, about which more will be said later, between Household and taxpayer that the shares acquired by the latter would not be sold, and such shares were still owned by taxpayer at the time of the hearing before the Tax Court.

Household did not take a deduction on its income tax returns for 1948 or 1949 or any other year for compensation of taxpayer by reason of the spread between the $18.70 per share price of the shares sold to taxpayer and the fair market value of such shares. On July 9, 1948, Household filed a report with the Securities and Exchange Commission, in which it was stated that the consideration of the granting of the stock option to taxpayer was the "acceptance of employment by Mr. MacDonald," and in statements sent to its stockholders in 1948, stated that the purpose of the stock option granted taxpayer was to "induce" and to "encourage" him "to accept employment with the company."

As found by the Tax Court, the taxpayer conceded at the hearing that he did not consider his right to acquire stock at a price substantially below its market value as a gift but regarded it as an inducement to accept employment with Household. The Tax Court in its opinion among other things stated:

"After careful consideration of the entire record in the instant case, with particular attention to the various negotiations which culminated in the option agreement and employment contract granted to petitioner, to the correspondence between petitioner and the then president of the company, and to the various statements issued by the company regarding petitioner's employment and the stock option granted to him, we have concluded that the option price was determined with the intent that it compensate petitioner. We recognize that there may have been a fixed intent that petitioner acquire and hold his stock as a permanent investment in the corporation. Nevertheless, we think it clear that the option price was established with the intent that he acquire such stock at a price substantially lower than its market price as a reward for services to be rendered."

We agree with the statement thus made, notwithstanding taxpayer's urgent and in some respects persuasive argument that the sole purpose and in-

538

tention of the parties was to enable tax-payer to acquire a proprietary interest in Household in accordance with the latter's policy relative to its corporate officials. There is no doubt but that the option was given to taxpayer in connection with a contract of employment. It was an essential element thereof and without it there would have been no such contract and no such employment. It is also plain that it was given as an inducement to taxpayer to change his employment from Schenley to Household by affording him a means by which he could recoup the losses sustained by his change in employment. Obviously, as taxpayer concedes, the profit inherent in the opportunity to purchase shares at a bargain price was not a gift; in fact, we are not aware of any theory by which officers can make a gift of the property of a corporation. Its disposition without adequate consideration would generally, if not always, constitute a fraud upon the shareholders. Therefore, the question inevitably arises as to the purpose which Household had in offering its stock to taxpayer at a price grossly less than its fair market value. In our view, the answer must be that it was to obtain the services of taxpayer. He had nothing else to offer and Household nothing else to acquire by reason of the employment contract. We thus conclude that the option to purchase stock at a bargain price was compensatory in part, that is, to the extent of the difference between the option price of the shares and their fair market value.

This result is not inconsistent with the policy of Household in requiring its executive officials to acquire a proprietary interest in the corporation. Taxpayer, like all stockholders of the corporation, acquired such an interest; in fact, the option in connection with the employment agreement served a twofold purpose, that is, it enabled taxpayer to acquire a proprietary interest and at the same time to receive compensation in addition to that which was otherwise provided.

In our judgment, a more serious question is presented as to whether taxpayer under the attending circumstances realized a taxable gain in 1949 (the year in which the option was exercised) and, if so, whether such gain can properly be measured, as the Tax Court has done, by the difference between the option price of the shares and their fair market value as evidenced by their selling price on the New York Stock Exchange. As stated in the Commissioner's brief, "In this case the Commissioner determined that the taxpayer's income in the nature of compensation derived from the stock option was realized and to be measured at the time he acquired the stock through exercise of that option," and "the amount of such compensation would necessarily be the difference between the option price and the fair market value of the stock when the option was exercised and the stock acquired."

Taxpayer makes a twofold attack upon this reasoning: (1) that an agreement existed between him and Household that he would not sell any of the shares during his employment with Household, which precluded the shares from having any ascertainable fair market value in taxpayer's hands, and (2) that the restrictions contained in Sec. 16(b) of the Securities Exchange Act likewise precluded any ascertainment of the fair market value during 1949. Taxpayer's contention on this score is disposed of both by the Tax Court and by the Commissioner in brief fashion. In fact, we think the contention has been brushed aside without adequate consideration. With reference to the first point, the Commissioner in his brief states, "As the Tax Court pointed out, however, it is extremely doubtful that this vague understanding could effectively bind the taxpayer and, in any event, it appears that he could have resigned and then sold his stock." No contention is advanced that a restriction on the right to sell would not affect the fair cash market value of the shares. We suppose the agreement is referred to as "vague" be-

cause it was oral rather than written. Again *no point is made that an oral agreement would not be binding.*

■ We have examined the testimony, which discloses that there was a definite, certain agreement that the shares of stock acquired by taxpayer under the option agreement would be retained by him as long as he was employed by Household. As heretofore shown, the employment agreement was entered into June 14, 1948, for a period of three years, with no right of termination subsequent to June 14, 1949. We think the statement of the Commissioner that the taxpayer "could have resigned and then sold his stock" borders on the absurd. In other words, taxpayer, in order to remove the restriction which the parties by agreement had imposed upon the stock could have relinquished his lucrative position with Household, breached his employment agreement with it and subjected himself to an action therefor. The Commissioner on this point cites Commissioner of Internal Revenue v. Smith, 324 U.S. 177, 65 S. Ct. 591, 89 L.Ed. 830, which held under the facts of that case that the taxable event was the year in which the corporate stock was acquired under an option to purchase. There is no support in that case, however, for the proposition that the fair market value of such stock would not be affected by a restriction on the right to sell.

This court, in Schuh Trading Co. v. Commissioner, 95 F.2d 404, regarding the effect on the value of corporate stock which could not be sold for a period of six months, stated at page 411:

> "If it was not salable, there was no market for it. There was, therefore, no market value until the restriction should be removed."

In support of that statement we cited Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 499, 57 S.Ct. 569, 577, 81 L.Ed. 755, which held that stock with a restrictive agreement on the right of sale "did not have a fair market value, capable of being ascertained with reasonable certainty, when they were acquired by the taxpayers." A restrictive agreement on the right to sell stock was similarly treated in Propper v. Commissioner, 2 Cir., 89 F.2d 617, 618. The Commissioner also cites O'Malley v. Ames, 8 Cir., 197 F.2d 256, 257, for the general principle that fair market value is "the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy nor to sell and both being informed." It is not discernible how that principle is of any aid to the Commissioner in the instant situation where the owner of the stock is not a "willing seller" but where, in fact, he is precluded by an agreement from so doing.

Section 16(b) of the Securities Exchange Act of 1934 provides in substance that any profit realized by a director or officer of a corporation from the sale of stock within a period of less than six months is recoverable in a suit by the issuing corporation or, in the case of its refusal to sue, in a suit by a stockholder on behalf of and for its benefit. It is also provided that no such suit shall be brought later than two years after the date when such profit was realized. As already noted, the stock was acquired by taxpayer on October 4, 1949, hence the six-month period would not have expired until April 4, 1950. Taxpayer contends that this provision is applicable and that as a result the shares were frozen in his hands during the six-month period, in other words, that he was not free to sell the shares or, in any event, if he had done so, the profits realized would have been forfeited to the corporation (Household).

The sole argument advanced by the Commissioner in opposing taxpayer's contention on this point is embodied in the following statement: "This argument assumes, contrary to the well supported findings of the Tax Court, that the difference between the option price and the fair market value of the stock when acquired did not constitute compensation for the taxpayer's services."

We assume from this statement that if the difference between the option price and the fair market value of the stock when acquired represented something other than compensation, the statutory provision would be applicable. The fallacy of the argument, however, resides in the fact that the question as to whether such differences represented compensation is the principal issue in the case. Both the taxpayer and Household have contended from the beginning, and still contend, that the difference did not represent compensation. Moreover, we seriously doubt that stock issued as compensation does not come within the statute under discussion. Certainly there is no language in the provisions which so indicates. Commissioner cites one case, however, Truncale v. Blumberg, D.C., 88 F.Supp. 677, affirmed Per Curiam Truncale v. Scully, 2 Cir., 182 F.2d 1021, in support of his position. Recovery was denied in that case and there is language to the effect that stock issued as compensation for services is not covered by the Act. At the same time the main reason for denying recovery in that case was that the stock was sold for less than the market value on the date it was acquired and hence no profits were realized. A more pertinent observation is found in Lockheed Aircraft Corp. v. Campbell, D.C., 110 F.Supp. 282, 284, where the court after reviewing and citing numerous cases stated:

> "So if a transaction comes within the inhibition of the statute, it matters not, as happened in this case, that the stock came into the hands of the defendant as a part of a policy of the corporation to compensate some of its highranking executives for a rather drastic cut in salaries which went into effect at about that time."

We think that for our present purpose we are not required to decide whether Sec. 16(b) is applicable. The many cases cited in U.S.C.A. following the section disclose that it has been a fruitful source of litigation and that it has been given a liberal interpretation. For instance, the court in Smolowe v. Delendo Corp., 2 Cir., 136 F.2d 231, 239, 148 A.L.R. 300, stated:

> "We must suppose that the statute was intended to be thoroughgoing, to squeeze all possible profits out of stock transactions, and thus to establish a standard so high as to prevent any conflict between the selfish interest of a fiduciary officer, director, or stockholder and the faithful performance of his duty."

It is true that the section does not preclude the sale of stock. As stated in Consolidated Engineering Corp. v. Nesbit, D.C., 102 F.Supp. 112, 114:

> "It will be noted from the above that Section 78p does not make the purchase and sale of stock unlawful or irregular. It provides only that the profits, if any, shall be recovered by the corporation."

The statute, however, does make the seller liable for profits realized from such sale. As was stated in Park & Tilford, Inc. v. Schulte, 2 Cir., 160 F.2d 984, 988:

> "Under the statute the amount recoverable by plaintiff is the receipts from the sale of the stock, minus the actual purchase price."

Even though we find it unnecessary to decide the question, we are strongly inclined to the view that the statute is applicable and that if the taxpayer had sold the stock during the six-month period following its acquisition, he would have been liable to account to the corporation for all profits. And it can be said to a certainty that if he had done so he would have laid himself open to an action for the recovery of such profits, with the probability that he could not have defended successfully. Furthermore, the only legal defense which the Commissioner now suggests, that is, that the Tax Court has found that the stock was issued as compensation for services, would have been of no benefit to the taxpayer at that time, particularly in view of the fact that both he and Household

contended then and still contend, no doubt in good faith, that the stock was not issued for that purpose.

The situation of the parties and the issues involved can be aptly described by a homely but simple illustration. Farmer A employs B to work on his farm for a designated period of time at a fixed compensation. In addition and in connection with the employment agreement, A for a price of $50 sells B a cow, the fair cash market value of which is $100. At the time B becomes the owner of the cow he has realized an economic gain in the amount of $50. Suppose, however, that at the time B is employed there is an agreement between the parties which precludes B from selling the cow during the period of his employment. The cow still has a fair market value of $100 in other hands but not in those of B. Assume further that B sells the cow for the market price in violation of his agreement and finds that there is a law which requires him to account to A for $50, the profit which he realized on the sale. With such restrictions, the cow, insofar as B is concerned, would have no fair market value. This illustration is analogous to the instant situation. Taxpayer acquired the corporate stock with an agreement not to sell and, in addition, if he had violated this agreement and sold the stock, he probably would have been required to account for the profits. Certainly he would have been faced with a legal action to recover such profits. This is not to say that he did not realize economic gain upon purchase of the stock but, even so, the question remains as to the proper formula for the ascertainment of the amount and extent of such gain. The Tax Court has held that it is the difference between the option price and the fair market value of the stock on the New York Stock Exchange at the time of its acquirement. We disagree with that conclusion. Whether there is some other formula by which such gain can be ascertained, either in 1949 or some other year, we are not called upon to decide.

The views which we have expressed concerning the restrictive effect of Sec. 16(b) find strong support in the testimony of expert witnesses, which is not mentioned in either the Tax Court's opinion or the Commissioner's brief. Taxpayer's expert, a prominent Chicago lawyer who specialized in corporate practice and who was familiar with the Securities Exchange Act, particularly Sec. 16(b), testified that in his opinion taxpayer could not have sold the stock until after the expiration of the six-month period without being liable for profits realized. He also gave as his opinion that it would have been difficult to find an underwriter or broker who would have participated in the sale of such stock because if he did so with knowledge of the situation he might be liable, together with the taxpayer, in a suit to recover profits. On the other hand, the Commissioner offered a witness who appears to have been qualified to testify as an expert. He gave as his opinion that Sec. 16(b) would not affect the fair market value of the shares but only concern the profits which taxpayer might be required to pay back to the corporation. On cross-examination, however, the witness admitted that Sec. 16(b) constituted a restraint upon sale of the shares and that he was unable to evaluate its effect upon their market value. Finally, he admitted that he would exclude the restraint imposed by 16(b) in determining value because taxpayer could sever his employment with Household, which would result in the removal of any restriction.

The testimony of these expert witnesses clearly shows that neither the taxpayer nor any other person under similar circumstances would be a willing seller, with knowledge that all profits realized might inure to the benefit of the corporation, and it is doubtful if any person cognizant of the circumstances would become a willing buyer.

The decision of the Tax Court is reversed and the cause remanded, without prejudice to any further proceedings not inconsistent with this opinion.