FLOYD R. BURNS and BILLIE J. BURNS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Burns v. Commissioner
Docket No. 7309-71.
United States Tax Court
T.C. Memo 1974-220; 1974 Tax Ct. Memo LEXIS 101; 33 T.C.M. (CCH) 977; T.C.M. (RIA) 74220; August 26, 1974, Filed. George F. Saunders, for the petitioners. Michael J. O'Brien, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined a deficiency in petitioners' Federal income tax in the amount of $11,628.18 for the taxable year 1966. The sole issue presented is the valuation of 6,420 shares of stock in Community National Life Insurance Co. received by Petitioner Floyd R. Burns as compensation. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits *102 are incorporated by reference. Petitioners Floyd R. Burns and Billie J. Burns, husband and wife, resided in Oklahoma City, Oklahoma, when they filed their petition herein. Their joint Federal income tax return for the taxable year 1966 was filed with the district director of internal revenue at Oklahoma City, Oklahoma. Billie J. Burns is a petitioner only by virtue of having filed a joint return with her husband, and Floyd R. Burns will, therefore, sometimes be referred to as petitioner. Petitioner was primarily engaged in the business of negotiating mergers and acquisitions on behalf of corporate entities during the taxable year involved. He represented Community National Life Insurance Co. (Community National) in negotiations which led to the acquisition of three insurance companies by Community National during 1966. Community National, whose principal place of business was located in Tulsa, Oklahoma, was incorporated in the State of Oklahoma on June 20, 1960, with 20,000 shares of class A (voting) common stock authorized. On various dates its authorized classes of stock and numbers of shares were increased by amendments to its articles or incorporation. Community National's *103 authorized stock was as follows: Date
Class A Voting
Class A Non-voting
Class B Voting
Class B Non-voting 6/20/60
20,000 ($2.50 par)
7/20/60
50,000 ($2.00 par)
50,000 (2.00 par)
4/3/61
100,000 ($1.00 par)
100,000 ($1.00 par)
5/24/63
900,000 ($1.00 par)
100,000 ($1.00 par)
3/22/66
4,900,000 ($1.00 par)
100,000 ($1.00 par)
The total shares of stock of Community National issued and outstanding at the beginning and end of 1966 were as follows: 1/1/66
12/31/66 Class A Non-voting
773,103
1,118,050
Class B voting
100,000
100,000
In July 1965, petitioner entered into a nonexclusive brokerage agreement with Standard Reserve Insurance Co., a Texas corporation, for the disposition of that corporation's assets or stock. Standard agreed to pay petitioner as compensation an amount equal to 5 percent of the fair market value of the assets or stock received by Standard in exchange for its assets or stock if petitioner's services resulted in a substantial change of ownership of the corporation. Petitioner contacted several prospective purchasers with respect to the acquisition of Standard before approaching *104 the president of Community National, Jimmie J. Ryan. Ryan indicated an interest in such an acquisition and authorized petitioner by letter to negotiate for Community National a merger agreement between the two corporations. The letter, dated November 8, 1965, contained the following: This letter will serve as your authorization to negotiate a merger contract by and between Community National Life Insurance Company and Standard Reserve Insurance Company of Gainesville, Texas. The fee for your services shall be five (5%) per cent of the total adjusted book value placed on Standard Reserve Insurance Company. The fee is payable, provided you are successful in securing a signed contract from Standard Reserve Insurance Company. In the event a contract is not drawn within one hundred eighty (180) days, and is later secured by Community National Life Insurance Company, a fee of two (2%) per cent of the total adjusted book value shall be paid, further providing that you use your best efforts to complete the contract. On December 17, 1965, the stockholders of Standard through their representatives, offered to exchange all of their 100,000 outstanding shares for 102,500 class A *105 non-voting shares of Community National, 97,500 shares were to be distributed equally among the four stockholders of Standard and 5,000 shares were to be distributed equally between petitioner and Roy V. Montgomery, Jr., who had referred Standard to the petitioner. The formal offer by Standard stockholders contained the following restrictions on disposition of Community National stock received: We agree that none of the acquired Community National Life stock shall be sold upon the open market, or otherwise, until February 1, 1967; and that no more than 10% of each shareholder's stock shall be sold in any calendar year, beginning February 1, 1967. We agree to remain in capacity of Vice Presidents beginning the year of 1966, at a salary of $15,000.00 per year, payable monthly, plus percentage at year end based on the attached formula. Unless the offer herein made is accepted and completed by 5 P.M., December 24, 1965, the same shall automatically be withdrawn. If accepted, we agree to produce all of said stock at your office, properly assigned, by December 24, 1965. We further agree that if this offer is accepted, that no other executive salaries, bonuses or dividends shall *106 be paid out of Standard Reserve pending the stock exchange. The offer was accepted by Community National on the same date. Petitioner received the 2,500 shares of Community National on January 3, 1966, for his services in successfully negotiating the merger. During the taxable year 1966, petitioner also successfully negotiated the acquisition by Community National of Kennedy National Life Insurance Co., a Missouri corporation, and he received 3,200 shares of Community National on July 7, 1966, as compensation for his services. On August 29, 1966, petitioner received 720 shares of Community National for successfully negotiating the acquisition by Community National of the Fidelity Reserve Life Insurance Co., an Arkansas corporation. The shareholders of Fidelity agreed that the stock received by them in the merger was restricted stock. None of the stock was to be sold publicly for 25 months. The following numbers of shares of class A non-voting Community National stock were, therefore, received by petitioner during the taxable year 1966 for his services. Date of Receipt
No. of Shares 1/3/66
2,500
7/7/66
3,200
8/29/66
720
TOTAL
6,420
Certificates *107 for all of the shares received by petitioner were issued in the name of Floyd R. Burns. The certificates contained no legend of restrictions on disposition of the stock. Separate brokerage accounts were maintained by petitioners during the taxable year 1966 at A.G. Edwards & Sons, stockbrokers. Mr. Burns sold 500 shares of the Community National stock received by him in connection with the Standard merger through his Edwards account at 12-3/4 per share ($6,375) on July 5, 1966.The following schedule reflects sales of Community National stock by Mrs. Burns directly or through her brokerage account: No. of Shares
Date Sold
Date Acquired
Price/Share
Net Proceeds 1000
1/3/66
8-5/8
$ 8,621.56
1000
1/5/66 [1]
1/3/66
8-7/8
8,871.44
600
1/10/66
9-1/2
5,600.80
400
1/11/66
9
3,535.87
500
3/1/66
1/3/66
12-1/4
6,028.75
500
6/3/66
1/3/66
11-1/2
5,750.00
1000
7/19/66 [2]
6/22/66 (500)
12-5/8
12,625.00
7/7/66 (500)
500
8/25/66
7/7/66
12-1/2
6,250.00
[3] 500
8/26/66
7/7/66
12-3/4
6,375.00
[3] 200
10/3/66
7/7/66
12-3/4
2,550.00
*108 All 2,500 of the shares of Community National received by petitioner on January 3, 1966, in connection with the Standard merger were sold by the petitioners by July 5, 1966. By October 6, 1966, petitioners had sold 1,700 of the 3,200 shares received by Mr. Burns on July 7, 1966. Of the 6,420 shares of Community National received by Mr. Burns as compensation in 1966, a total of 4,200 shares were sold by petitioners during 1966. In 1967, petitioners transferred 1,200 to 1,800 of the remaining shares as part of the purchase price of a home in Oklahoma City, Oklahoma. Quotations representing a guide to the range at which 100 shares of Community National class A non-voting stock could have been bought or sold were submitted to the Daily Oklahoman, an Oklahoma City newspaper, by members of the National Association of Securities Dealers (NASD). Such prices [1] of Community National stock, which represented prices for the day preceding the Daily Oklahoman's date of publication, were as follows: Date
Bid
Asked December 1, 1965
7-3/4
8-1/2
January 4, 1966
9
10
January 6, 1966
9-1/2
10-1/2
February 2, 1966
11-7/8
12-1/2
April 2, 1966
12-3/4
13-3/4
May 17, 1966
11-3/4
12-1/2
June 2, 1966
11-2/4
12-1/2
June 4, 1966
11-1/2
12-1/2
July 2, 1966
12-7/8
13-3/8
July 6, 1966
12-3/4
13-3/4
July 8, 1966
12-3/4
13-3/4
July 20, 1966
13
14
August 2, 1966
13
14
August 26, 1966
12-1/2
13-1/2
August 27, 1966
13
13-3/4
August 30, 1966
13
13-3/4
September 3, 1966
12-3/4
13-3/4
October 4, 1966
12-3/4
13-3/4
*109 The following representative NASD interdealer prices for Community National stock which did not include retail markup, markdown, or commission were published in the Daily Oklahoman: Date
Bid
Asked December 2, 1966
12-1/2
13-1/4
January 4, 1967
7-1/4
8
February 7, 1967
8-1/4
9-1/4
On their income tax return for 1966, petitioners reported as ordinary income the Community National stock received by Mr. Burns at a value of one-half of the quoted prices on the respective dates of receipt or a total value of $33,520. Such valuation was based upon conclusions of Mr. Burns and his accountant, Mr. Burns contending that he must have permission from Jimmie J. Ryan, president of Community National, to transfer any of the stock. In his statutory notice of deficiency, the Commissioner determined a fair market value of $71,542.50 for the 6,420 shares of stock received by petitioner. The following table reflects the values reported by petitioners on their return and the values determined by the Commissioner in his statutory notice: No. of Shares
Date of Receipt
Value on Return
Commissioner's Value 2500
1/3/66
$4.00
$ 8.625
3200
7/7/66
6.00
12.75
720
8/29/66
6.00
12.75
*110 OPINION The sole issue presented for decision is the valuation of 6,420 shares of Community National received by petitioner in 1966 as compensation. The issue is factual.Corporate stock received as compensation for services rendered is taxable as ordinary income in an amount equal to its fair market value on the date of transfer. Sec. 61(a) (1),Internal Revenue Code of 1954; sec. 1.61-2(d) (4), Income Tax Regs.
Petitioners contend that an oral agreement existed between Jimmie J. Ryan, president of Community National, and Mr. Burns requiring the president's prior approval before Mr. Burns could sell his Community National shares and that such an agreement constituted a restriction against the transfer of his shares so as to materially affect the value. Petitioner relies upon MacDonald v. Commissioner, 230 F.2d 534 (C.A. 7, 1956), reversing 23 T.C. 227 (1954); Mailloux v. Commissioner, 320 F.2d 60 (C.A. 5, 1963), reversing a Memorandum Opinion of this Court; and William H. Husted, 47 T.C. 664 (1967). The respondent contends that no such oral agreement with Community National's president existed and even *111 if it did such restriction was unenforceable and did not have a significant effect on petitioner's ability to dispose of the stock. Petitioners rely on the uncorroborated testimony of Mr. Burns to prove the existence of the agreement to restrict transfers of the stock. They produced no written evidence to support such agreement, and, in fact, Ryan's letter authorizing petitioner to conduct the merger negotiations on behalf of Community National and setting forth Burns' fee of 5 percent of the adjusted book value of Standard made no reference to such an agreement. The agreements between Community National and the shareholders of both Standard and Fidelity do not recite such a restriction against petitioner. In their agreements, the shareholders of Standard and Fidelity agreed that the sale of their stock was to be restricted for a prescribed period of time. Petitioner was neither a shareholder of those corporations nor a party to such agreements. His brokerage agreements with the negotiating parties were separate and apart from the merger agreements. Petitioner sold 65 percent of the stock in less than 13 months which disproves an effective restriction on the sale of petitioner's *112 stock, or at least approval of the sales by Jimmie J. Ryan. As corroboration of the alleged restriction, petitioner relies upon procedures followed by him in transferring the shares from himself to his wife prior to sale. He testified that Community National would not transfer on its books shares in his name which he sold, but he provided no explanation as to why the procedure for transferring shares from himself to his wife was not used on July 5, 1966, when he sold 500 of the shares in his own name through his own account at A.G. Edwards. Petitioners did not offer the testimony of Jimmie J. Ryan or any other Community National officer to corroborate the existence of the restrictions. Petitioners' counsel stated at trial that Ryan had canceled his arrangements to appear as a witness and that Rex Rudy, a former vice president of Community National, decided not to testify as scheduled, after it was learned that Ryan refused to testify upon advice of his counsel. No subpoena was issued to compel the testimony of Rudy or Ryan. Upon completion of the trial, the record was left open so that either Ryan or Rudy could be subpoenaed by petitioners but the Court was informed by petitioners' *113 counsel at a subsequent hearing that petitioners were "reluctant" to subpoena Rudy. We can only conclude under the circumstance that the testimony of Ryan and Rudy would be unfavorable to petitioners. Wichita Terminal Elevator Co., 6 T.C. 1158 (1946), affd. 162 F.2d 513 (C.A. 10, 1947). Based upon the record before us, we find that there was no oral agreement in 1966 restricting the transfer of shares of Community National owned by petitioner. Even if such an agreement existed between Ryan and Burns, there is nothing to indicate that the agreement existed between Community National and Burns. Ryan was only president of Community National. A restriction on the transfer of shares of Community National must be between Community National and the stockholder. The Community National stock certificates received by petitioner contained no legend reflecting a restriction on transfer. Oklahoma law provides, as follows: Unless noted conspicuously on the security a restriction on transfer imposed by the issuer even though otherwise lawful is ineffective except against a person with actual knowledge of it. [12A Okl. St. Ann. sec. 8-204] [2]
*114 The cases relied upon by petitioners are distinguishable. In MacDonald v. Commissioner, 230 F.2d 534 (C.A. 7, 1956), reversing and remanding 23 T.C. 227 (1954), both this Court and the Court of Appeals found that the taxpayer had an oral agreement that stock acquired by him pursuant to options granted when he entered into an executive employment contract with Household Finance Corp. would be retained by him so long as he was employed by the corporation, barring an emergency necessitating sale of the stock. We found that the agreement did not bind the taxpayer and prevent the sale of his shares. We also concluded that section 16(b) of the Securities and Exchange Act of 1934 relating to the sale of stock by corporate insiders did not affect the value of the stock acquired by the taxpayer. In reversing this Court, the Court of Appeals held that the restrictive oral agreement did affect the fair market value of the stock and that section 16(b) constituted a restraint upon the sale of the shares for a six-month period. a Unlike MacDonald, we conclude from this record that no oral agreement existed between petitioner and Community National. Petitioner *115 was not an employee of Community National and he provided us with no showing that his brokerage relationship with Community National would have been affected had he sold the shares without Ryan's permission. Mailloux v. Commissioner, 320 F.2d 60 (C.A. 5, 1963), reversing a Memorandum Opinion of this Court, is also distinguishable. The stock involved there, which could only be sold with the approval of the principal promoter of the venture, was highly speculative uranium mining stock. A restriction was placed on the sale of the stock in that case because the taxpayers received one-fourth of the outstanding shares of the corporation and the promoter wished to avoid depressing the price of the stock by overselling the market. The taxpayers in Mailloux were able to sell only about 20 percent of their shares during the taxable year due to the presence of the restrictions. We found as a fact the existence of such a restriction which finding was not disturbed by the Court of Appeals. William H. Husted, 47 T.C. 664 (1967), is likewise distinguishable. The taxpayer in that case was a specialist in corporate acquisitions who developed a plan for the acquisition *116 of a trailer manufacturing business which was then submitted to the Dorsey Corp. Through a maneuver far more complicated than presented in the instant case, the taxpayer was permitted to purchase 4,200 shares of the acquiring Dorsey Corp. and later exchange 30,000 shares of a corporation organized by him for shares of Dorsey, all of which were offered to him at an advantageous cost as compensation for his services in arranging the acquisition. Although no restrictions were noted on the face of the certificate received by the taxpayer in Husted, as is also true of the immediate case, disposition of the stock was significantly restricted by the following factors not found here: (1) the taxpayer executed an "investment letter" for each block of shares in which he warranted to Dorsey that he was acquiring the stock for investment and "without any intention of selling or distributing the same"; (2) the 4,200 shares were subject to a repurchase agreement in favor of Dorsey in the event the acquisition was not completed; (3) taxpayer's stock represented a significant portion of the outstanding stock of Dorsey and exceeded the amount of Dorsey stock sold on the exchange in each of the six *117 months following the acquisition; and (4) there was a possibility that the taxpayer's resale of the stock within six months of receipt could have violated section 16(b) of the Securities and Exchange Act of 1934. Even were we to find that convincing evidence pointed to the existence of restrictions on transfer, petitioner has not offered sufficient evidence to prove the effect of the alleged restriction upon the fair market value of the stock. Heiner v. Gwinner, 114 F.2d 723, 725 (C.A. 3, 1940). Petitioner's accountant was not qualified to render an opinion as to the value of the stock, and he did not appear as an expert witness for the petitioner. He only testified as to how he arrived at a valuation of approximately 50 percent of the quoted values for the shares. Furthermore, the sales of stock by petitioner at prevailing market prices tends to disprove any depressing effect on the fair market value of the stock. Decision will be entered for the respondent. Footnotes
1. These shares were originally sold for a Mr. Forbess. Community National stock received by petitioner on January 3, 1966, however, was substituted for these shares and delivered to Edwards, and the Forbess stock was sold on January 10 and 11. The sales proceeds based on the higher price per share were given to Mr. Forbess. The Oklahoma Code comment indicates that this section is merely a rewording and simplification of the Uniform Stock Transfer Act, formerly 18 Okl. St. Ann. sec. 1.103, rather than a material change in substance. The predecessor section stated that "There shall be no lien in favor of a corporation upon the shares represented by a share certificate issued by such corporation, and there shall be no restriction upon the transfer of shares so represented by the virtue of any by-laws of such corporation, or otherwise, unless the right of the corporation to such lien or the restriction is stated in the share certificate." [2]↩ These shares were purchased by petitioners at 12-1/4 per share ($6,125) and were not shares received by petitioner as compensation for his services. 3. These shares were sold to Hagen Investments in Mrs. Burns' name. ↩
1. Quoted asked prices included commissions. ↩