**Aaron L. KOLOM and Serita Kolom, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 79–7077.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 4, 1980.

Decided April 9, 1981.

Hilbert P. Zarky, Mitchell, Silberberg & Knupp, Los Angeles, Cal., on brief; S. Zachary Samuels, Los Angeles, Cal., argued, for petitioners-appellants.

Gilbert E. Andrews, M. Carr Ferguson, Washington, D. C., on brief; Donald B. Susswein, Atty., Washington, D. C., argued, for respondent-appellee.

Before WALLACE, SKOPIL and REINHARDT, Circuit Judges.

WALLACE, Circuit Judge:

Aaron L. Kolom and Serita Kolom[1] appeal from a decision of the United States Tax Court determining a deficiency in their federal income tax for the taxable year 1972 in the amount of $43,792. The issue before us is whether restrictions placed upon the sale of stock by section 16(b) of the Securities Exchange Act of 1934 (the Act) affect the valuation of stock for purposes of asserting a minimum tax when stock options are exercised. We affirm.

## I

During the taxable year 1972, Kolom was an officer and director of Tool Research and Engineering Corporation (Tool Research). Kolom had received options to purchase shares of Tool Research stock pursuant to an employees' stock option plan. The plan met the qualification requirements of sections 421 and 422 of the Internal Revenue Code of 1954 (the Code).[2] In 1972, Kolom

---

1. Serita Kolom is a party by reason of having filed a joint return with her husband.

2. Section 421. GENERAL RULES.
   (a) EFFECT OF QUALIFYING TRANSFER. —If a share of stock is transferred to an individual in a transfer in respect of which the requirements of section 422(a), 423(a), or 424(a) are met—
   (1) except as provided in section 422(c)(1), no income shall result at the time of the transfer of such share to the individual upon his exercise of the option with respect to such share;
   (2) no deduction under section 162 (relating to trade or business expenses) shall be allowable at any time to the employer corporation, a parent or subsidiary corporation of such corporation, or a corporation issuing or assuming a stock option in a transaction to which section 425(a) applies, with respect to the share so transferred; and
   (3) no amount other than the price paid under the option shall be considered as received by any of such corporations for the share so transferred.

   . . .

   Section 422. QUALIFIED STOCK OPTIONS.
   (a) IN GENERAL.—Subject to the provisions of subsection (c)(1), section 421(a) shall apply with respect to the transfer of a share of stock to an individual pursuant to his exercise of a qualified stock option if—
   (1) no disposition of such share is made by such individual within the 3-year period beginning on the day after the day of the transfer of such share, and
   (2) at all times during the period beginning with the date of the granting of the option and ending on the day 3 months before the date of such exercise, such individual was an employee of either the corporation granting such option, a parent or subsidiary corporation of such corporation, or a corporation or a parent or subsidiary corporation of such corporation issuing or assuming a stock option in a transaction to which section 425(a) applies.

   . . .

exercised some of these options. The dates of exercise, the number of shares received, the mean price of the stock on the New York Stock Exchange on the date of exercise, and Kolom's option price were as follows:

| Date of Exercise | Number of Shares | Mean Price Per Share on N.Y.S.E. | Option Price Per Share | Total Option Price |
|---|---|---|---|---|
| 9/15/72 | 6,678 | $52.00 | $13.25 | $88,464 |
| 10/5/72 | 4,174 | 45.25 | 12.00 | 50,088 |
| 10/5/72 | 1,575 | 45.25 | 19.625 | 30,909 |

The stock received by Kolom could have been resold on the New York Stock Exchange at the price quoted above on the date the option was exercised. If Kolom had sold the stock on that date (or at any time within six months of that date), however, he would have been subject to the provisions of section 16(b) of the Act, 15 U.S.C. § 78p(b),[3] and he could have been required to give up any profit he made on such sales.

On September 15, 1972, when Kolom exercised the first of his options, the closing market price of Tool Research stock on the New York Stock Exchange was 51⅛. Six months later the mean price of the stock on the exchange was 23⅝. On October 5, 1972, when Kolom exercised his remaining options, Tool Research stock closed at 44. Six months later the mean price of the stock on the exchange was 20⅜.

When Kolom filed his income tax return for 1972, he completed and filed Form 4625, "Computation of Minimum Tax." Kolom showed tax preference items totaling $111,-398, including accelerated depreciation and capital gains. The stock options, however, were not reflected in the minimum tax computation. On the last sheet of his return, Kolom included the following statement:

Statement 9—Form 4625 Footnotes

During 1972 taxpayer exercised his option to purchase Tool Research Co. stock.

The taxpayer is not treating this as preference income for the following reason:

Income Tax Regulation 1.57–1(f)5(i) states that there is no tax preference if the stock is disposed of in the year the option is exercised. By law, the taxpayer could not sell the stock in the year the option was exercised because all of his profit would belong to the corporation. The stock is being sold the year in which the taxpayer is first able to sell the stock. Because of the above reason and because the nature of the tax consequences are the same whether the taxpayer sold the stock in the year the option was exercised or the succeeding year, the item is not being treated as a tax preference item in 1972.

Kolom's return for 1972 was examined and audit changes were made with respect to adjustments other than the minimum tax. He received a letter dated January 15, 1975, from the District Director stating that the revenue agent's report had been reviewed and accepted. Approximately a year later, Kolom received a telephone call from a revenue agent regarding his liability for minimum tax in 1972. After an examination of Tool Research's books and records, revenue agent Beal had submitted a written request for approval to reopen Kolom's 1972 tax liability. The reasons stated for the request were a "substantial error" and a "serious administrative omission resulting

3. Section 16(b) of the Securities Exchange Act of 1934 provides in part:

For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer ... within any period of less than six months ... shall inure to and be recoverable by the issuer ....

15 U.S.C. § 78p(b).

in criticism, undesirable precedent or inconsistent treatment." The request for reopening was approved, and Kolom was so notified in January 1976.

The Commissioner determined a deficiency of $42,489 on the basis of the imposition of the minimum tax on the aggregate amounts by which the fair market values of the shares of stock acquired pursuant to the qualified stock options exceeded their option prices on the dates of exercise. Subsequently, the Commissioner asserted an additional deficiency of $1,303, making the total deficiency $43,792. This increased deficiency resulted from a recomputation of the market value-option price differential, on the basis of the mean price on the New York Stock Exchange on the date of exercise, rather than the closing price on the date of exercise.

On appeal, Kolom contends that (1) the Tax Court erred in determining that the bargain element of the options for the purpose of computing the minimum tax is the difference between the mean New York Stock Exchange price on the date of exercise and the option price without regard to section 16(b) profit restrictions, and (2) the Tax Court improperly concluded that Kolom was not subjected to an impermissible second examination in determining his 1972 tax deficiency.

## II

This case deals primarily with the tax consequences of Kolom's exercise of stock options that qualify for special tax treatment provided in sections 421 and 422 of the Code. The Code provides that a qualified stock option may be granted to an individual in connection with his employment, enabling that employee to acquire stock of his employer at prices less than the market value of the stock, without resulting in a realization of taxable income to the employee either when the option is granted, or when it is exercised. As long as the taxpayer holds the shares of stock for at least three years and meets the other technical requirements, he will be taxed only when he ultimately sells or otherwise disposes of the shares of stock. At the time of disposition, the gain is taxed at favorable long-term capital gains rates. As a result, the "bargain element" of the option present at the time of exercise (the difference between the fair market value and the option price at the time of exercise) receives the same deferred capital gains treatment that the underlying shares receive.

Because many high income taxpayers could use the tax preference provisions to avoid significant tax liability, sections 56 and 57 of the Code were enacted.[4] These sections impose a minimum tax on taxpayers with large amounts of income from stock options, capital gains, and other sources receiving preferential tax treatment. Section 57(a)(6) states that there shall be included as an item of tax preference with respect to the transfer of a share of stock pursuant to the exercise of a qualified stock option, "the amount by which the fair market value of the share at the time of exercise exceeds the option price." Thus, these sections impose a tax on a portion of the "bargain element" of the transaction.

The primary issue in this dispute is the method by which this bargain element subject to minimum taxation is to be deter-

---

4. Section 56. IMPOSITION OF TAX.
   (a) IN GENERAL.—In addition to the other taxes imposed by this chapter, there is hereby imposed for each taxable year, with respect to the income of every person, a tax equal to 10 percent of the amount (if any) by which—
   (1) the sum of the items of tax preference in excess of $30,000, is greater than
   (2) the sum of—
   (A) the taxes imposed by this chapter for the taxable year . . . reduced by the sum of the credits allowable . . . [and]

   (B) the tax carryovers to the taxable year.
   Section 57. ITEMS OF TAX PREFERENCE.
   (a) IN GENERAL.—For purposes of this part, the items of tax preference are—

   . . . . .

   (6) STOCK OPTIONS—With respect to the transfer of a share of stock pursuant to the exercise of a qualified stock option (as defined in section 422(b)) or a restricted stock option (as defined in section 424(b)), the amount by which the fair market value of the share at the time of exercise exceeds the option price.

mined. The parties disagree about the fair market value of the shares at the time Kolom exercised his option. Kolom contends that section 16(b) of the Act is relevant to the determination of fair market value. As an officer and director of Tool Research, if Kolom had sold the stock within six months of the date he exercised the options, he could have been required to turn over any profits to Tool Research. He asserts, therefore, that the fair market value of the stock at the time of exercise was equal to the option price, because that is the amount he would have been able to retain if the stock had been sold on that day.

The Commissioner maintains, however, that the fair market value of the stock was its mean price on the New York Stock Exchange on the date of exercise. The Commissioner further contends that section 16(b) is totally irrelevant to the determination of fair market value for purposes of section 57(a)(6). For this argument, he relies upon Income Tax Regulation 1.57–1(f)(3) which states:

> In accordance with the principles of section 83(a)(1), the fair market value of a share of stock received pursuant to the exercise of a qualified or restricted stock option is to be determined *without regard to restrictions* (other than nonlapse restrictions within the meaning of § 1.83–3(h)). Notwithstanding any valuation date given in section 83(a)(1), for purposes of this section, fair market value is determined as of the date the option is exercised.

(Emphasis added). Regulation 1.83–3(h) provides that "[l]imitations imposed by registration requirements of State or Federal security laws or similar laws imposed with respect to sales or other dispositions of stock or securities are not nonlapse restrictions." Thus, the Commissioner asserts that because section 16(b) is a limitation imposed by federal security law, section 16(b) does not affect the fair market value of the stock.

On appeal, Kolom advances three separate arguments with respect to the determination of fair market value. First, he ar-gues that Income Tax Regulation 1.57–1(f)(3) is inconsistent with section 57(a)(6) as applied in this case because it applies section 83 to the qualified stock option section of the minimum tax provisions when section 83(e)(1) specifically prohibits the application of section 83 to stock acquired pursuant to a qualified stock option. Second, he asserts that the minimum tax imposed on the difference between the trading price of the stock and the option price on a taxpayer subject to section 16(b) is unconstitutional because it results in double taxation and income taxation on a transaction in which there has been an economic loss. Third, he contends that the long established definition of fair market value takes section 16(b) into account to satisfy the "willing seller" requirement of that definition.

### A.

Kolom contends that regulation 1.57–1(f)(3), which uses the principles of section 83 to compute fair market value for purposes of the minimum tax, is inconsistent with the section 83(e)(1) express exclusion of section 421 stock. Under section 83, the acquisition of stock in connection with the performance of services is subject to tax in the amount of the difference between the fair market value of the stock, "determined without regard to any restriction other than a restriction which by its terms will never lapse," and the amount paid for the stock by the taxpayer. I.R.C. § 83(a)(1). Section 83(e) states that "[t]his section shall not apply to . . . a transaction to which section 421 applies . . . ." Kolom argues that sections 56 and 57 do not state that section 83 or any of the regulations thereunder shall apply to section 57. Only the Treasury Regulations, which are established by the Commissioner and not by the Congress, mention the applicability of section 83. Therefore, he argues, section 83 and all the regulations thereunder do not apply to qualified stock options. He further contends that regulation 1.57–1(f)(3), as it relates to section 83, is inconsistent with section 57(a)(6) as it applies to qualified stock options and, therefore, it is invalid.

Kolom has attempted to show the invalidity of regulation 1.57–1(f)(3) by examining the legislative history of section 83. He argues that Congress intended section 83 to govern restricted stock plans but not qualified stock option plans like the one involved in the instant case.[5] Although we find that the legislative history of section 83 does indicate a Congressional intent to attach different tax benefits to restricted stock plans than to qualified stock option plans, we have been unable to find any Congressional intent to distinguish between the plans with respect to the method by which fair market value is to be determined. We agree with the Tax Court that:

[t]he regulations do not provide for inclusion in a taxpayer's taxable income of the value of the stock received upon exercise of a qualified stock option. Rather, the regulations apply the valuation principles of section 83 in determining the fair market value of stock received by a taxpayer upon exercise of a qualified stock option. Therefore, we see no merit in petitioners' assertion that section 1.57–1(f)(3) of the regulations is invalid because of an inconsistency with section 83(e)(1).

*Kolom v. Commissioner*, 71 T.C. 235, 241 (1978). Regulation 1.57–1(f)(3) does not have any effect upon qualified stock option plans from the standpoint of income taxation. Rather, the regulation merely defines the bargain realized by the taxpayer upon the exercise of the qualified stock option, in order to subject that bargain to an entirely different tax treatment, the minimum tax. *Harrison v. United States*, 475 F.Supp. 408, 412 (E.D. Pa. 1979).

### B.

Kolom further contends that the minimum tax is unconstitutional as applied in the instant case, because it results in double taxation and income taxation on a transaction in which he has suffered an economic loss. He argues that when a taxpayer is subject to section 16(b), the minimum tax is imposed on a gain that cannot be realized until at least six months after the date of exercise. The gain realized, therefore, cannot be recognized until the ultimate disposition of the stock. He alleges that a mere deferral of a realized gain, which could be completely eliminated by a decline in the value of the stock before the time of sale, is not income and therefore should not be subject to taxation.

In response to Kolom's argument, the Tax Court found that:

[t]he flaw in this argument is that a gain is realized upon exercise of the option itself. At that time petitioner acquired property the value of which substantially exceeded the price paid for the property. Were a gain not realized at this time, the nonrecognition provisions of sections 421 and 422 would be superfluous. *See Commissioner v. LoBue*, 351 U.S. 243 [76 S.Ct. 800, 100 L.Ed. 1142] (1956); *Commissioner v. Smith*, 324 U.S. 177 [65 S.Ct. 591, 89 L.Ed. 830] (1945). It is true that within the 6-month period following exercise of the options, petitioner may not be able to reduce his realized gain to cash without disgorging part or all of the profit to the corporation. It is also true that a decline in market value during the 6-month period in which the provisions of section 16(b), Securities Exchange Act of 1934 are applicable could eliminate any gain on the sale of the stock during that period. That risk, however, is one the petitioner assumed when he chose to exercise the stock options. It does not follow, however, that merely because petitioner could not reduce his gain to cash for 6 months without incurring a section 16(b) liability, he had no gain.

*Kolom v. Commissioner, supra*, 71 T.C. at 250.

We agree with the Tax Court that at the time Kolom exercised the options he did realize an economic benefit. Kolom himself testified that he could have pledged the

---

5. Qualified stock option plans are generally considered a means to provide employees with a stake in the business, whereas restricted stock plans are considered merely deferred compensation arrangements. Senate Committee on Finance, Tax Reform Act of 1969, S.Rep. No.552, 91st Cong., 1st Sess. 120 (1969), U.S. Code Cong. & Admin. News 1969, 1645.

stock as collateral against a loan based upon the fair market value of the stock on the New York Stock Exchange. In addition, Kolom received other rights incident to ownership of the stock, such as voting rights and the right to receive dividends. *See Sakol v. Commissioner*, 574 F.2d 694, 700 (2d Cir.), *cert. denied*, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 168 (1978).

■ Although we have never addressed this issue, the Second Circuit has rejected a claim similar to Kolom's that the valuation of stock without regard to a temporary restriction is constitutionally improper. In *Sakol v. Commissioner, supra,* the court upheld the constitutional validity of subjecting a taxpayer of restricted stock to income taxation without regard to the temporary impact the restrictions would have on the value of the stock. The court found that the rule of section 83(a) that temporary restriction should be ignored for valuation purposes might appear arbitrary but that "... a workable, practical system of taxing employees' restricted stock options can overlook, at least temporarily, a speculative decrease in value in ascertaining the amount of compensation received in the form of restricted stock where the employee has obtained both voting power and dividend rights." *Id.* at 700 (footnotes omitted). The court went on to state:

> Congress is not required to take each and every restriction into account in combating tax-avoidance, or to make equally difficult individual evaluations which depend upon the parties' subjective intentions. Rather, the Sixteenth, and Fifth, Amendments permit the line drawn to be a rough one, in the interest of realistically solving a practical problem . . . .

*Id.* We are convinced that the valuation principles involved in the instant case in computing the minimum tax require the same types of lines to be drawn as the valuation principles involved in *Sakol* required. Accordingly, we find that the minimum tax is not unconstitutional as applied to a taxpayer subject to section 16(b).

## C.

■ Kolom's final challenge to the determination of fair market value is that the established definition of fair market value includes the notion of a willing seller, and that as a result of the section 16(b) restriction on the stock, Kolom could not have been a willing seller. Fair market value has been defined as " 'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.' " *United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973), *quoting* Treas. Reg. § 20.2031–1(b). The Tax Court decided that the willing buyer/willing seller test does not refer to Kolom's own unwillingness to sell under the particular circumstances of his case. Rather, the test concerns hypothetical buyers and sellers in the market place. *See Estate of Reynolds v. Commissioner*, 55 T.C. 172, 195 (1970). We are persuaded by the Commissioner's argument that Kolom's unwillingness to sell his stock on the date he exercised the options is irrelevant to the determination of fair market value.

Kolom has attempted to support his contention that section 16(b) operates as an exception to the use of the quoted market price as fair market value by relying upon cases in which the owner of the stock was actually restricted from selling or transferring the property on the open market. *Mailloux v. Commissioner*, 320 F.2d 60 (5th Cir. 1963) (agreement that required the approval of the principal promoter before sale); *Cohu v. Commissioner*, 8 T.C. 796 (1947) (shares could not be sold without written consent of Commissioner of Corporations); *Goldwasser v. Commissioner*, 47 B.T.A. 445 (1942), *aff'd*, 142 F.2d 556 (2d Cir.), *cert. denied*, 323 U.S. 765, 65 S.Ct. 119, 89 L.Ed. 612 (1944) (contract provision requiring no public offering of stock). These cases all involve situations in which the owner could not legally dispose of the stock. The case before us is different: the stock was freely tradeable on the market at the market price. We are therefore not per-

suaded that these cases support Kolom's position.

Kolom also attempts to show that section 16(b) liability is to be an adjustment to the listed price of the stock in determining the fair market value by relying upon *Cummings v. Commissioner*, 506 F.2d 449 (2d Cir. 1974), *cert. denied*, 421 U.S. 913, 95 S.Ct. 1571, 43 L.Ed.2d 779 (1975); *Anderson v. Commissioner*, 480 F.2d 1304 (7th Cir. 1973); and *MacDonald v. Commissioner*, 230 F.2d 534 (7th Cir. 1956). Both *Anderson* and *Cummings* involved the question of the tax treatment of the disgorging of profits required by section 16(b). We agree with the Commissioner that these cases are not helpful. Here Kolom never had any 16(b) liability because he did not sell or dispose of any of the stock within the six month period following the exercise of the options.

In *MacDonald v. Commissioner, supra*, the taxpayer had exercised an option to purchase stock of the corporation of which he was an officer and director. The court found that the stock options exercised by the taxpayer had been granted with the intent of compensating the taxpayer for services to be rendered, and that, therefore, the taxpayer had received compensation income at the time of the exercise of the stock options. The case was remanded to the Tax Court, however, for a reconsideration of the proper formula for determining the amount of compensation income realized by the taxpayer, in light of the effect of section 16(b) and the taxpayer's agreement not to sell the stock. *MacDonald v. Commissioner, supra*, 230 F.2d at 540–41. The court specifically stated that it was not deciding whether section 16(b) had an effect on the fair market value of the stock at the time the option was exercised. *Id.* at 540. Any statements in the opinion concerning the effect of 16(b) on the market value of the shares are therefore dicta. Nevertheless, we are unpersuaded by the *MacDonald* court's statement that:

> [N]either the taxpayer nor any other person under similar circumstances would be a willing seller, with knowledge that all profits realized might inure to the benefit of the corporation, and it is doubtful if any person cognizant of the circumstances would become a willing buyer.

*Id.* at 541. As we have said, although we recognize that section 16(b) may have discouraged Kolom from selling his stock, it would have no demonstrable effect upon the market value of the shares. Section 16(b) affects only the seller's ability to keep the profits after disposing of the stock, not the marketability of the stock itself.

### III

Kolom also argues that the deficiency asserted by the Commissioner resulted from a prohibited second examination of his books and records under section 7605(b) of the Code.[6] The Tax Court found that the reopening of Kolom's case had not resulted from a second examination of his books and records. In fact, no second examination had ever taken place. The reopening instead resulted from an examination of the books and records of Tool Research. On appeal, Kolom now argues that there was an oral agreement between the Internal Revenue Service (IRS) and Kolom on the original audit of his tax return, and that this agreement precludes the IRS from reopening his case.

Section 7121 of the Code provides for binding closing agreements between the IRS and a taxpayer with respect to any taxable liability.[7] Section 7121, however, requires a written closing agreement authorized or approved by the Secretary. We

---

6. Section 7605(b) provides:

(b) RESTRICTIONS ON EXAMINATION OF TAXPAYER—No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer

*in writing* that an additional inspection is necessary.

(Emphasis added).

7. Section 7121 provides in part:

CLOSING AGREEMENTS.

(a) AUTHORIZATION.—The Secretary or his delegate is authorized to enter into an agreement *in writing* with any person relating to the liability of such person (or of

have no evidence of such a written agreement in this case. Section 7122 of the Code allows for the IRS to compromise any case prior to referring the case to the Department of Justice for prosecution or defense. Treasury Regulation 301.7122–1(d)(3) provides that such an offer to compromise shall be accepted only when the taxpayer is notified in writing. We find no such evidence of notification in the instant case. The audit report sent by the revenue agent to Kolom contained no mention of any such closing agreement or offer to compromise. As a result we find the reopening of Kolom's case was not prohibited.

AFFIRMED.

the person or estate for whom he acts) in respect of any internal revenue tax for any taxable period.
(b) FINALITY.—If such agreement is approved ·by the Secretary or his delegate (within such time as may be stated in such agreement, or later agreed to) such agreement shall be final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact—
(1) The case shall not be reopened as to matters agreed upon. . . .
(Emphasis added).